**UNITED STATES of America**

v.

**Paul R. BARBOUR and Kellie A. Moran, Defendants.**

**No. 00–CR–267.**

United States District Court, N.D. New York.

June 6, 2001.

---

James A. Resti, Syracuse, NY, for Defendant Barbour.

Christina Cagnina, Syracuse, NY, for Defendant Moran.

Daniel J. French, United States Attorney, United States Attorneys Office, Northern District of New York (Andrew T. Baxter, Elizabeth S. Riker, Assistant U.S. Attorneys, Of Counsel). Syracuse, NY, for United States.

## MEMORANDUM–DECISION AND ORDER

MORDUE, District Judge.

### I. Introduction

Presently before the court are motions by defendants Paul R. Barbour and Kellie

A. Moran seeking a stay of execution of their respective sentences of imprisonment, imposed on April 4, 2001, pursuant to Criminal Procedure Rule 38(b), Appellate Procedure Rule 9(b) and 18 U.S.C. § 3143(b). The government opposes said applications.

## II. Factual and Procedural Background

On May 31, 2001, Barbour and Moran entered pleas of guilty to separate one-count informations charging each defendant with conspiracy to defraud Nationwide Insurance Company ("Nationwide") through use of the mails in violation of 18 U.S.C. § 371. The facts under which these pleas arose are as follows: Defendant Paul Barbour, a licensed attorney, was employed as in-house claims counsel for Nationwide from November 1987 until his discharge in December 1998 due to circumstances resulting from the instant criminal matter. Defendant Kellie Moran is a Registered Nurse with whom Barbour had been in a long-term friendship/romantic relationship. In a scheme to defraud Nationwide, Barbour and Moran conspired to create a medical records consulting service which they used to steal money paid by the insurance company on claim files assigned to Barbour. To wit, Barbour had the authority to make payment in claim files on behalf of Nationwide in amounts up to $50,000. Moran filed a d.b.a. entitled "Medical Evaluation Services of CNY" ("MES") on April 3, 1998, listing the company address as a post office box in the Carousel Mall in Syracuse, New York. On the same date, Moran also executed a Power of Attorney granting Barbour authority over all of her business and personal transactions. Finally, Moran opened a bank account at Fulton Savings Bank in the name of MES.

Between April 7, 1998 and November 19, 1998, Barbour authorized and issued 144 claim payments in amounts between $400 and $1,800, for a total of $213,800 to MES. Barbour created the checks on his laptop computer which had the capacity to generate company drafts from Nationwide's office in Columbus, Ohio. After generating the checks, Barbour mailed them to the above-referenced mall post office box. Barbour failed to record the tax identification number for MES on the checks which was required by Nationwide on all payments to medical providers. These checks were purportedly payment for 144 medical records evaluations in cases where a claim was made against one of its insureds. However, Nationwide received only one such written evaluation from MES. A review of the claim files found 143 of the payments issued by Barbour to MES were issued after the claim files had been closed. In addition, many of the claim files contained independent medical exam and record review reports from other providers. Only one claim file had a medical records review report from MES to substantiate payment, but the check that was issued reflected payment was made seven days before the date that the report was completed. Additionally, investigators found no invoices from MES in any of the subject claim files.[1]

---

1. A search of Barbour's desk at Nationwide revealed 33 invoices from MES dated between May 1, 1998, and June 29, 1998, as well as a cover letter dated March 12, 1998, which outlined a billing and payment agreement reached between Barbour and Moran. This letter was not signed by Moran and the government alleged that it and the invoices were created by Barbour in an attempt to conceal the fraud. When first interviewed by Nationwide, Barbour maintained Moran had conducted peer reviews for him for the three previous years but was never paid because they were waiting until she filed a d.b.a.. Barbour told Nationwide's investigators that after the d.b.a. was filed, he and Moran

A review of the checks issued by Barbour showed each were cashed and/or deposited at Fulton Savings Bank to the account set up by Moran in the name of MES, with endorsements of "Kellie Moran or For Deposit Only." In June 1998, Moran temporarily relocated to Virginia, but maintained the post office box at the Carousel Mall in the name of MES. During the time she was in Virginia, Barbour collected the checks mailed to the mall post office box and deposited them in the Fulton Savings Bank account on behalf of Moran. In addition, Barbour completed numerous ATM withdrawal transactions on this account. Nationwide's internal investigation revealed that Barbour and Moran used the proceeds of the aforementioned checks from Nationwide to pay for personal items and expenses. Barbour also used his Nationwide corporate credit card to pay for charges incurred by him and Moran locally and while on vacation. These credit card bills were paid with funds issued to MES by Nationwide.

Defendants appeared initially for arraignment on August 10, 1999, with Emil Rossi, Esq., who stated on the record that he was jointly representing defendants for the sole purpose of the arraignment. Mr. Rossi advised the Court that otherwise he would be appearing only for defendant Barbour while Ms. Moran would thereafter be represented by Patricia Campbell, Esq.. Following the arraignment, defense counsel requested further discovery from the government. Specifically, defendants sought full access to each of the claim files involved in the case in which allegedly fraudulent payments had been made, including access to the medical records in such claim files. The U.S. Attorney's Office moved for a protective order denying defense counsel access to this information but ultimately consented to the relief sought and made all of the requested documents available for review by defendants.

Pursuant to identical written plea agreements executed on May 31, 2000, defendants Barbour and Moran conceded their participation in the above-described scheme in the section entitled *"Factual Basis for the Plea"* which stated as follows:

> [DEFENDANT] admits the following facts, which establish [his/her] guilt on the offense stated in the one-count Information:
>
> a. In 1998, [PAUL R. BARBOUR and KELLIE A. MORAN] willfully agreed … to attempt to defraud Barbour's employer, Nationwide Insurance Company by paying KELLIE A. MORAN for medical evaluation services purportedly performed by her, doing business as "Medical Evaluation Services of CNY," which services were not, in fact, performed.
>
> b. In his capacity as an employee of Nationwide, PAUL R. BARBOUR caused checks totaling approximately $213,800 to be issued by Nationwide, all made payable to "Medical Evaluation Services of CNY." These checks were purportedly issued in payment for approximately 140 medical evaluations; but, in fact Nationwide only ever received one written evaluation from KELLIE A. MORAN or Medical Evaluation Services of CNY.
>
> c. KELLIE A. MORAN collected approximately $195,650 of the funds of Nationwide which PAUL R. BARBOUR caused to be paid to Medical Evaluation Services of CNY, and KELLIE A. MORAN conducted further financial transactions specified in

agreed that he would issue payments to her for work supposedly done during the previous three years over time so as not to create one large payment to MES.

the Information in order to share illegal proceeds with Barbour.

d. In furtherance of the conspiracy, PAUL R. BARBOUR, with the knowledge and approval of KELLIE A. MORAN, caused to be delivered by mail, according to the direction thereon, to 10148 Carousel Center, Syracuse, New York, envelopes containing the checks from Nationwide payable to "Medical Evaluation Services of CNY," on or about the dates specified in the Information.

In exchange for the defendants' execution of waivers of indictment on the informations and pleas of guilty, the government agreed to move to dismiss an earlier indictment issued against defendants and not to oppose the imposition of the least severe sentence permitted within the applicable guideline range. Notably, both defendants and the government stipulated in the plea agreements that the offense charged and relevant conduct involved "more than minimal planning" warranting a two-level increase to the offense level pursuant to U.S.S.G. § 2F1.1(b)(2). In addition, defendant Barbour stipulated to a two-level enhancement of his total offense level pursuant to U.S.S.G. § 3B1.3 because he "abused a position of private trust, [as staff counsel to Nationwide] which significantly facilitated the commission and concealment of the offense." The plea agreements also stated that if the defendants demonstrated "acceptance of responsibility" for the offense through the time of sentencing, the government would recommend a three-level decrease in the offense level for both defendants pursuant to U.S.S.G. § 3E1.1. The only issue not settled by the plea agreements was the amount of loss involved in the crime on which the parties agreed to argue and submit evidence at or before the time of sentencing.[2]

On May 31, 2000, the same day they executed the plea agreements, defendants appeared before this Court, along with their attorneys Mr. Rossi and Ms. Campbell, to enter pleas of guilty on the record. The transcript of the proceeding clearly demonstrates that defendants' pleas to the charged offense and relevant conduct were voluntary and unequivocal. Moreover, both defendants stated on the record that they were satisfied with the performance of their counsel. After defendants and their counsel provided sufficient information to satisfy the Court that defendants were voluntarily waiving their right to a trial on the charged offense with full knowledge of the possible consequences of such action, the Court accepted their guilty pleas.[3] The Court set the date for

2. The government took the position that the intended loss in the case was $213,800, the total amount of the checks issued to MES. Since Nationwide was able to stop payment on ten checks issued by Barbour on November 18, 1998, the company reported its actual loss at $195,650. At the plea hearing, defense counsel stated they intended to review the claim files with their clients and would take a position on the amount of loss prior to sentencing.

3. The following are excerpts from the plea hearing held on May 31, 2000:
THE COURT: Can you tell me your attorney's name?

DEFENDANT MORAN: Yes. Patti Campbell.
THE COURT: Is she appointed by the Court or hired by you?
DEFENDANT MORAN: Hired.
THE COURT: Are you satisfied with her representation of you?
DEFENDANT MORAN: Yes, sir.
THE COURT: Has she advised you of your rights?
DEFENDANT MORAN: Yes, she has.
THE COURT: Is there anything you would like to ask the Court about your rights at this time?

DEFENDANT MORAN: No, sir.

THE COURT: All right. Has Ms. Campbell or any assistant United States attorney or any government agent or anyone else made any promise that you would be treated leniently or any other kind of promise to induce you to plead guilty this morning?

DEFENDANT MORAN: No.

THE COURT: Has any force or threat been used against you to induce you to plead guilty?

DEFENDANT MORAN: No, sir.

THE COURT: Are you pleading guilty freely and voluntarily?

DEFENDANT MORAN: Voluntarily, yes.

THE COURT: Would you tell me your attorney's name?

DEFENDANT BARBOUR: Emil Rossi.

THE COURT: Was he hired by you?

DEFENDANT BARBOUR: Yes.

THE COURT: Are you satisfied with his representation of you?

DEFENDANT BARBOUR: Yes, your Honor.

THE COURT: Has Mr. Rossi advised you of your rights?

DEFENDANT BARBOUR: Yes.

THE COURT: Is there anything you would like to ask the Court about this proceeding this morning?

DEFENDANT BARBOUR: No, your Honor.

THE COURT: Has Mr. Rossi or any U.S. attorney or any government agent or anyone else made any kind of promise that you would be treated leniently or any other kind of promise to induce you to plead guilty?

DEFENDANT BARBOUR: No.

THE COURT: Has anybody threatened or forced you in any way to plead guilty at this time?

DEFENDANT BARBOUR: No.

THE COURT: All right. Mr. Baxter, would you tell state for the record, does the government have sufficient evidence to prove these defendants guilty beyond a reasonable doubt?

MR. BAXTER: We believe we do.

THE COURT: Would you state what the government would prove if this case were to go to trial?

MR. BAXTER: Yes, your Honor. First of all, let me note that the conspiracy charge in the indictment has the following elements:

First, that two or more persons entered into an unlawful agreement to defraud Nationwide Insurance through the use of the mails as charged in the Information.

Second, that each defendant knowingly become a member of that conspiracy.

Third, that one of the members of the conspiracy knowingly committed at least one of the overt acts charged in the information.

And, four, that an overt act was committed to further some objective of the conspiracy.

In order to prove this conspiracy charge at trial, the United States would prove that in 1998 Ms. Moran and Mr. Barbour entered into a conspiracy to defraud Mr. Barbour's employer, Nationwide Insurance, where he was working as a claims attorney. The scheme essentially was devised to pay Ms. Moran for providing services, basically medical evaluations of medical records and files that Mr. Barbour controlled at Nationwide doing business as Medical Evaluations Services of Central New York. The scheme essentially was to pay her for services that she did not provide, at least in part.

In his capacity as an employee of Nationwide, Mr. Barbour caused checks totaling approximately $213,800 to be issued payable to Ms. Moran's company. These checks were purportedly issued in payment for approximately 140 medical evaluations on 140 different files. In fact, Nationwide only found in its files one written medical evaluation. Ms. Moran collected approximately $195,650 of the funds which Nationwide caused to be paid to her company because Nationwide was able to stop payment on a few of the checks. There was some financial transactions thereafter carried out which are specified in the overt act section of the Information by which the defendants shared some of the proceeds of the fraud.

In furtherance of the conspiracy, Mr. Barbour caused a number of checks to be delivered by Nationwide Insurance by mail to a post office box that Ms. Moran and he opened at the Carousel Center.

We would be prepared to prove this through the testimony of other employees and investigators of Nationwide Insurance as well as documentary evidence from Nationwide and other sources.

THE COURT: Thank you, Mr. Baxter. All right, Ms. Moran, you just heard what the government said about what they could prove. Is that what you did? Is that what occurred in this case?

DEFENDANT MORAN: Yes.

THE COURT: Mr. Barbour?

DEFENDANT BARBOUR: Yes, your Honor.

THE COURT: Okay. Ms. Campbell, is that also your understanding?

MS. CAMPBELL: Yes, your Honor.

THE COURT: Mr. Rossi?

MR. ROSSI: It is, your Honor.

. . . . .

THE COURT: All right. Mr. Baxter, will you inform everyone what the defendants' possible penalties are for the count involved here, and also about any stipulations in the plea agreement that relate to sentencing?

MR. BAXTER: Yes, your Honor. The statutory maximum penalty for the violations of Section 371 of Title 18 is five years imprisonment, a term of supervised release of to three years, a fine of up to $250,000 or up to twice the pecuniary gain of the defendants or lost to any victim of the offense of conviction.

The defendants will be required to pay restitution under the Statutory Victim Restitution Act, although we have essentially left that issue as to the amount of restitution to be determined at sentencing by the Court. The defendants will also be required to pay a special assessment of $100 at the time of sentencing. . . .

With respect to Ms. Moran, there's been a stipulation that the offense of conviction involves more than minimal planning and also if she continues to accept responsibility for the offense of conviction, she will receive a three point downward departure for acceptance of responsibility.

With respect to Mr. Barbour, he's stipulated to the enhancement for more than minimal planning. There is an enhancement for abuse of position of trust involving his employer. We have also stipulated that if he continues—

THE COURT: That is four points.

MR. BAXTER: Right. We have stipulated he would, if he continues to accept responsibility for his offense at the time of sentencing, with the Court's approval, obviously, he would receive a three point downward departure for acceptance of responsibility. The amount of loss remains open. Both parties have reserved their right to advocate with respect to the amount of loss that will have to be determined by the Court at the time of sentencing.

THE COURT: There is no surrender of the right to appeal this case.

MR. BAXTER: With respect to the sentencing. Obviously, pleading guilty waives certain rights that you have described, but with respect to the sentencing, there is no waiver of the right to appeal the sentence.

THE COURT: Okay. Ms. Moran and Mr. Barbour, have your attorneys discussed the sentencing guidelines with you?

DEFENDANT BARBOUR: Yes, your Honor.

DEFENDANT MORAN: Yes, sir, your Honor.

THE COURT: I have to inform you that I am not bound by any of the stipulations in the plea agreement. I am required to abide by the Sentencing Guidelines and to enforce the law as reflected in those guidelines. Do you both understand that?

DEFENDANT BARBOUR: Yes, your Honor.

DEFENDANT MORAN: Yes, your Honor.

THE COURT: Do you understand you may not withdraw your pleas of guilty here?

DEFENDANT BARBOUR: Yes, your Honor.

DEFENDANT MORAN: Yes, your Honor.

THE COURT: What you can appeal is the sentence that I impose. That is the only thing, really. What we are down to, counsel, we are going to be arguing sentencing guidelines.

MR. ROSSI: Yes, your Honor. In connection therewith, I think both counsel anticipate bringing applications for downward departures also.

THE COURT: Are you pleading guilty freely and voluntarily, both of you?

DEFENDANT BARBOUR: Yes, your Honor.

DEFENDANT MORAN: Yes, your Honor.

THE COURT: Have you read the Information containing the charge against you?

DEFENDANT BARBOUR: Yes, your Honor.

DEFENDANT MORAN: Yes, your Honor.

THE COURT: And have your attorneys explained those charges to you?

DEFENDANT BARBOUR: Yes, your Honor.

DEFENDANT MORAN: Yes, your Honor.

THE COURT: Do you understand the charges?

DEFENDANT MORAN: Yes, your Honor.

THE COURT: Mr. Barbour?

DEFENDANT BARBOUR: Yes, your Honor.

THE COURT: Do you realize the penalties that could be imposed after pleading guilty?

DEFENDANT MORAN: Yes, I do.

DEFENDANT BARBOUR: Yes.

THE COURT: Do you understand what I told you about my role under the Sentencing Guidelines?

DEFENDANT MORAN: Yes, your Honor.

DEFENDANT BARBOUR: Yes.

THE COURT: I am going to ask you the last question. Has anyone, apart from the plea agreement, made any promises to you in return for pleading guilty?

sentencing as September 29, 2000. At the request of defense counsel, the Court then adjourned the sentencing four times to afford defendants and their attorneys ample time and opportunity to review the insurance claims files involved in the case for the purpose of obtaining evidence regarding the amount of loss sustained by Nationwide as a result of defendants' conduct.

On February 16, 2001, defendants appeared for what was scheduled as a sentencing hearing with a new attorney, Christina Cagnina, Esq.. Ms. Cagnina advised the Court that after developing "communication problems" with Mr. Rossi and Ms. Campbell, defendants had decided to retain new joint counsel. Ms. Cagnina requested an adjournment of the sentencing to afford her the opportunity to review her clients' files thoroughly along with any relevant documents concerning sentencing. The government readily agreed to a six-week adjournment which the Court granted. On March 1, 2001, Ms. Cagnina filed fully executed consent to change attorney forms with the Clerk's office along with a notarized "Acknowledgment and Waiver of Conflict or Appearance Thereof" signed by her and both defendants which stated as follows:

> I, Paul Barbour and I, Kellie Moran do hereby acknowledge by retaining and requesting representation by Christina Cagnina, Esq. in the manner [sic] of criminal representation, in Federal Court, Northern District of New York,

that I acknowledge and waive any conflict or appearance thereof in her representation of me in this matter. I have been informed of the risks of joint representation, possible conflicts and consequences and hereby choose to have Christina Cagnina, Esq. represent me for the matter with knowledge and understanding that she will be representing the other above named person in the same matter. I hereby, by my signature, Waive my right to separate counsel and any claim of possible prejudice from joint representation.

Other than reviewing this Acknowledgment and Waiver, at no time during the February 16, 2001, hearing or subsequent sentencing hearing did the Court acknowledge or explore on the record the issue of defendants' joint representation by Ms. Cagnina.

In August 2000, the United States Probation Department filed its presentence investigation reports with respect to both defendants. The reports were identical in connection with describing the offense and relevant conduct for each defendant. The reports differed slightly with respect to discussing aspects of the defendants' plea agreements since defendant Barbour had stipulated to an additional two-level enhancement of his base offense level based on abuse of his position of trust with Nationwide. The reports also differed in assessing each defendant's acceptance of responsibility for the crime.[4] Insofar as

---

DEFENDANT MORAN: Not at all.
DEFENDANT BARBOUR: No, your Honor.

4. For example, when questioned by the probation department, defendant Barbour denied he and Moran intentionally worked together to defraud Nationwide and claimed only 10% of the checks he issued to MES were fraudulent. Barbour insisted that Moran performed medical records evaluations in most of the claim files in question and provided oral rath-

er than written reports. However, he admitted that he sometimes paid her by billing unrelated closed files. Barbour reported that he received approximately $20,000 from Moran for past legal services he had provided to her and about $13,000 to pay the balance of his car loan. When pressed for an admission regarding his responsibility for the offense, Barbour merely stated his actions in failing to properly document his expense and billing activities were "stupid" and that he knowing-

computation of the offense level for sentencing purposes, the probation department determined that the base offense level for both defendants was 16. To wit, both reports stated as follows:

The United States Sentencing Commission Guideline for violation of 18 U.S.C. § 371 is found in U.S.S.G. § 2XI.I which instructs the base offense level is the offense level from the guideline for the substantive offense, plus any adjustments from such guideline for any intended offense conduct that can be established with reasonable certainty. The guideline applicable to the substantive offense is found under U.S.S.G. § 2F1.1, and calls for a base offense level of 6. The loss in this case is $213,800, the amount of money Barbour attempted to fraudulently pay to Moran.[5] Pursuant to U.S.S.G. § 2F1.1(b)(1)(1), if the loss was more than $200,000, but not more than $350,000, the offense level is increased by 8 levels. Barbour authorized 143 fraudulent payments to Moran's business, Medical Evaluation Services of CNY, over a period of seven months. Pursuant to U.S.S.G. § 2F1.1(2), if the offense involved more than minimal planning, the offense level is increased by 2 levels. Therefore, the base offense level under U.S.S.G. § 2X1.1 is 16.

According to this calculation, both defendants began with a base offense level of 16. Added to Barbour's base was the additional two-level enhancement pursuant to U.S.S.G. § 3B1.3 for abuse of his fiduciary responsibility to his employer, Nationwide, bringing his total offense level to 18. Based on the defendants' equally marginal acceptance of responsibility for engaging in the offense conduct, the probation department determined that the promised three-level downward departure was not warranted. After completing his investigation, the assigned probation officer determined that both defendants had a criminal history category of I and that Barbour's total offense level was 18 while Moran's was 16.

On March 26, 2001, Ms. Cagnina filed separate sentencing memoranda with regard to each defendant. In the case of Mr. Barbour, Ms. Cagnina argued that he had demonstrated acceptance of responsibility by cooperating with the investigation and executing the plea agreement. Further, she argued that Barbour had admitted his failure to obtain approval from Nationwide to use MES as an outside service provider as well as his failure to properly document his agreement to pay Moran for services rendered three years before her d.b.a. was established. Cagnina averred that Barbour also acknowledged his payments to MES were "overly generous" in comparison to other providers. Cagnina argued that Barbour's actions were driven in part by "his own pride in not wishing to appear unable to handle his work-load due to his lack of some basic medical knowledge. He now

---

ly spent Nationwide's money in a way the company never would have approved.

With respect to Kellie Moran, she also denied that there was any fraud in connection with 90% of the payments made to her company by Barbour. She stated all of the payments were made for work she had performed prior to her establishment of a d.b.a.. Moran insisted that she provided Barbour with oral reports of medical reviews in lieu of written reports to avoid being subpoenaed to

testify if a case went to trial. Moran reported that her payment of money to Barbour after receiving the checks from Nationwide was for past legal services and reimbursement to him of her portion of vacation expenses.

**5.** According to the commentary to U.S.S.G. § 2F1.1, a sentencing court should base the offense level on the intended amount of loss if it can be determined rather than the actual loss if the former figure is higher.

admits this was wrong and that he mislead [sic] the company by supplanting his lack of knowledge on company money."

In connection with the issue of the amount of loss, Cagnina argued that "the basis for which these payments [to MES] were deemed to be 'unauthorized' is not clear in the plea agreement." Defense counsel contended that based on various factors, it was "especially difficult to ascertain a specific amount of loss" in the case.[6] Ms. Cagnina also argued that the Court should decline to accept the stipulation in the plea agreement concerning "more than minimal planning" as such was duplicative of Mr. Barbour's stipulation to an upward departure based on his abuse of a position of trust. According to Ms. Cagnina, application of the "more than minimal planning" enhancement could be refuted upon proof that the repetitive acts completed by Barbour in furtherance of the crime were "purely opportune." Cagnina contended that it was within Barbour's range of job duties to disburse funds up to $50,000

without supervisor approval and engage various professionals to further his review of files. She argued that "the fact that his friend was in a field that would be useful to him was in a real sense 'purely opportune.'"

Ms. Cagnina also requested a downward departure from the guidelines for Mr. Barbour based on his family circumstances. Citing *United States v. Alba*, 933 F.2d 1117, 1122 (2d Cir.1991), *inter alia*, counsel contended that defendant Barbour's responsibility for the financial and emotional well-being of his children and his elderly parents as well as defendant Moran's children to whom he was a so-called "surrogate father" should be a mitigating factor. Cagnina also highlighted: 1) Barbour's commitment to his childrens' school and education; 2) his efforts to rehabilitate himself by acknowledging a problem with alcohol and attending Alcoholics Anonymous meetings; 3) Barbour's participation as a contestant on the "Who

6. In support of this contention, Ms. Cagnina argued as follows:

The investigative report from Nationwide insurance [sic], an interested party, indicates that Medical Evaluation Services did not have a phone number in the phone book and they suspected that it might not be an actual service. In addition, [sic] that MES had only provided one written report to the company on one file. The Defendant's contention is that the practice of payments for verbal reports to open and closed files and to various service providers without strict documentation is not only industry practice but was his understanding of Nationwide's general practice. Also, there is acknowledgment that work was done by MES on Nationwide files from Nationwide's own investigation and the uncontradicted statements of both the Defendant and Ms. Moran.... The Defendants have both reviewed a significant number of Nationwide files that checks were written on. This was somewhat an exercise in futility, as the Defendants are aware that their view of what payments were justified is

suspect. I am unaware if the prosecutors office has made any attempts to determine from an outside source if Nationwides' claims of loss are wholly legitimate. The factual circumstances do raise a legitimate question as to the true value of the loss. The defendants were both acting in their chosen and licensed fields which raises the question of value of the provided services. It can hardly be refuted that the defendant was not trained in the medical field and would have to rely on outside medical opinions for even basic medical issues. Also, the industry standard does allow for use of outside consulting in both the medical field and for additional legal support. In that regard, the defendant believed he was acting within his authority; as he had seen his own supervisor go to outside legal counsel and compensate them, pegging the payment to closed fries. Even assuming that MES never provided any actual work for Nationwide, the actual loss was below the level set in the probation report. I respectfully submit that all these factors support a departure of at least one level.

Wants to be a Millionaire" television program as well as his subsequent thwarted efforts to capitalize on that success by appearing on the nationally syndicated Rosie O'Donnell Show and writing a book detailing how to become a contestant on the show; [7] and 4) his unsolicited volunteer work at the Salvation Army and Hospice as well as in his community. Finally, attorney Cagnina argued that the loss of income Barbour had suffered already by way of suspension of his license to practice law, his inability to find other non-legal work and his frustrated attempts to become a game show contestant and author coupled with likely future disbarment created a harsh and excessive burden on Barbour warranting a downward departure.

On behalf of defendant Moran, Ms. Cagnina argued that she too had sufficiently accepted responsibility for her actions in the case to warrant the three-level decrease in her base sentencing level. Cagnina asserted that Moran had cooperated with the investigation of the crime and acknowledged that the manner in which she billed Nationwide and/or received payment for medical record evaluations from Barbour long after the work was completed could be viewed as fraudulent as well as her request that the billing be done this way to avoid the payments being viewed as a marital asset during her divorce. Attorney Cagnina stated that while Moran did not consider herself to be a "proficient business person" with complete awareness of "proper documentation and the fees that are appropriate and within limits for the field," she "realize[d] that her personal relationship wt. [sic] Mr. Barbour allowed her to bill for advice and assistance that any other business or individual simply could not."

Ms. Cagnina made the same arguments regarding the difficulty in ascertaining the amount of loss on behalf of defendant Moran that she had made on behalf of Barbour. Counsel also contended that defendant Moran's family circumstances warranted consideration in light of her two sons' health and emotional problems.[8] In addition, Cagnina highlighted defendant Moran's difficult divorce which was a motivating factor in her decision to conceal the business arrangement between her and Barbour as well as the anxiety disorder which afflicts Moran causing her to suffer from frequent panic attacks. Finally, counsel asserted that the loss of income which defendant Moran suffered due to adverse publicity about her involvement in this matter along with the likelihood that she might lose her nursing license rendering her unable to support her children or maintain health insurance for their continued care should be considered as mitigating factors.

On April 4, 2001, both defendants appeared for sentencing with their counsel, Ms. Cagnina. After reviewing submissions

---

7. Barbour's appearance with Rosie O'Donnell was summarily canceled when the show's producers learned of a press release announcing his involvement in the instant criminal matter; the publisher of the proposed book canceled its contract with Barbour a few weeks later.

8. The probation report noted that on January 18, 1999, defendant Moran's sons, ages 17 and 20, were involved in an automobile accident and sustained traumatic head injuries. In addition, both boys suffer from diabetes and emotional problems. Attorney Cagnina stated that defendant Moran was the only person available to monitor the boys' ongoing medical conditions. However, probation also reported that both boys were receiving social security disability income and living together in an apartment in Syracuse while defendant Moran has relocated to Cortland, New York, to obtain employment in the field of nursing.

by all involved parties and interested persons and hearing further oral arguments on the issue of sentencing, and after considering the personal statements made by the defendants prior to imposing sentence, this Court denied defendants' requests for downward departures based on their family circumstances. The Court found nothing extraordinary about defendants' family obligations or community ties such that either Barbour's or Moran's case fell outside of the "heartland" of cases under the federal sentencing guidelines.[9] With respect to the amount of loss, the Court accepted the figure set forth in the presentence report of $213,800, having been presented with no evidence by defendants to controvert it.[10] The Court acknowledged that under the sentencing guidelines, it was obligated to base the offense level on the total amount of intended loss since it was greater than the actual loss sustained by Nationwide which successfully stopped payment on some of the last checks issued by Barbour.[11]

The Court declined to disregard the stipulations in the plea agreements concerning "more than minimal planning," finding ample evidence of significant intent and forethought in the over 140 checks issued by Barbour to MES over the period in question. As a further matter, the Court did not find that either Mr. Barbour's subsequent rehabilitative efforts or defendants' reduced earning capacity and potential loss of professional licenses warranted consideration. Finally, despite the probation department's recommendation that defendants *not* be granted any downward departure based on "acceptance of responsibility" given their continued insistence that they had done next to nothing wrong in this case, the Court did grant both Barbour and Moran a three-level decrease in the total offense level based on their unequivocal admissions at the plea

---

**9.** *See United States v. Galante,* 111 F.3d 1029, 1034 (2d Cir.1997) ("Family circumstances, although not a forbidden basis for departing outside the Guidelines' heartland, are a discouraged basis for departure because the Commission has deemed them to be not generally relevant.... As we noted in *[United States v.] Johnson,* '[d]isruption of the defendant's life, and the concomitant difficulties for those who depend on the defendant, are inherent in the punishment of incarceration.' 964 F.2d [124,] 128 [(2d Cir.1992).] The presence of hardship resulting from imprisonment therefore does not warrant a downward departure. Only if the sentencing court determines that the hardship in a particular case is exceptional, may it depart downward on that basis.")

**10.** Ms. Cagnina's impassioned pleas about the "legitimate" question raised by defendants concerning the amount of loss were unfortunately unsupported by any evidence notwithstanding defendants' exhaustive review of the claim files in this case and their insistence that actual work was done on the files by MES. Although Cagnina argued that the amount of loss was actually less than that

which appeared in the probation report, neither she nor the defendants ever offered an alternative figure, much less submitted evidence on the issue. Moreover, at no time prior to or during the sentencing hearing did attorney Cagnina request a hearing on the issue of amount of loss or suggest that the Court should conduct any further inquiry on the issue.

**11.** *See United States v. Bradbury,* 213 F.3d 627, 2000 WL 562430, *1 (2d Cir. May 8, 2000) ("'Under section 2F1.1, loss does not always equal the actual financial harm suffered by the victim.' *United States v. Mucciante,* 21 F.3d 1228, 1238 (2d Cir.1994). Rather, '[w]here the 'intended' loss is greater than the 'actual loss,' intended loss will be used.' *Id.* (citing U.S.S.G. § 2F1.1, Application Note 7). Indeed, 'loss in fraud cases includes the amount of property taken, even if all or part has been returned.' *United States v. Carrozzella,* 105 F.3d 796, 805 (2d Cir. 1997); *see also Mucciante,* 21 F.3d at 1238; *United States v. Arjoon,* 964 F.2d 167, 172 (2d Cir.1992); *United States v. Brach,* 942 F.2d 141, 143 (2d Cir.1991)").

hearing.[12]

The foregoing resulted in defendants Barbour and Moran having total offense levels of 15 and 13 respectively. Based thereupon, the Court found that the sentencing guideline imprisonment range was 18 to 24 months with respect to defendant Barbour and 12 to 18 months for defendant Moran. The Court sentenced defendant Barbour to 18 months, the lowest term of imprisonment within the applicable range. It did the same with respect to Moran, sentencing her to a prison term of one year and one day. The Court also ordered defendants jointly and severally to pay restitution of $195,650, the amount of actual loss alleged to have been sustained by Nationwide as a result of defendants' crimes. The Court ordered both defendants to surrender to the Bureau of Prisons by reporting to his or her designated penal institution by May 8, 2001.

Attorney Cagnina filed Notices of Appeal on behalf of both defendants concerning their sentences on April 12, 2001. On April 20, 2001, both defendants filed applications to proceed *in forma pauperis*. Notwithstanding Fed. R.App. P. 9(b) which requires a defendant to first move in the district court to obtain a stay of sentence, Ms. Cagnina filed emergency motions with the Second Circuit Court of Appeals on behalf of both defendants on May 2, 2001, seeking stay of their sentences pending appeal. In these motions, Ms. Cagnina also sought to be relieved as counsel for defendants. In support of the motions, Ms. Cagnina submitted nearly identical affidavits in which she averred defendants had "several meritorious arguments for appeal." In particular, Ms. Cagnina noted that this Court had ignored the family circumstances of each defendant as well as failed to explain its decision to determine the amount of loss for defendants' crimes in accordance with the presentence report. In connection with her request to be relieved as counsel for defendants, attorney Cagnina essentially stated she was not competent to continue representing defendants based on her own lack of knowledge and/or experience:

> Though serving as trial attorney of record for the Defendant[s], your Deponent is not admitted to practice before the Second Circuit at this time. In addition, due to the exigent need for a stay and possibly an expedited appeal of this matter, an attorney with knowledge of the procedures and rules applicable to this matter will need to be involved immediately. I respectfully request to be relieved as counsel for the Defendant[s] on appeal and [sic] an attorney be assigned to represent the Defendant[s.]

Nowhere in either defendant's application did Ms. Cagnina make any reference to difficulties or conflicts of interest which arose in the context of her theretofore joint representation of defendants.

On May 4, 1992, the Second Circuit issued an order denying defendants' motions for a stay of surrender as well as Ms. Cagnina's motions to be relieved as counsel. Further, the Circuit ordered that the appeals be expedited and that Ms. Cagnina be assigned to represent *both* defendants pursuant to the Criminal Justice Act. Following an accelerated briefing schedule, the court ordered the appeals to be argued or submitted the week of July 23, 2001.

---

**12.** The Court granted these departures in spite of defendants' arguments at sentencing that their conduct did not rise to the level of such notorious outlaws as "Bonnie and Clyde." Indeed, defendant Barbour continued to insist during the sentencing hearing that he had only "sought to give work to a friend," had not "document[ed his billing activities] as well as might be," and that the whole scheme between him and Moran simply amounted to "bad bookkeeping."

At no time did attorney Cagnina contact the Court of Appeals or make any further motion before that court concerning her objection to or conflict in representing both defendants on appeal.

On May 7, 2001, attorney James Resti filed *ex parte* motions to stay execution of defendants' sentences of imprisonment on behalf of both Barbour and Moran via Orders to Show Cause. These applications raised for the first time the issue of attorney Cagnina's alleged conflict of interest in jointly representing defendants Barbour and Moran. In a single memorandum of law submitted by Mr. Resti on behalf of *both* defendants, attorney Resti stated he was retained by defendant *Barbour* for the purpose of the stay application. According to Mr. Resti, "Ms. Cagnina [was] disabled from making this stay application and prosecuting this appeal due to a conflict of interest by her joint representation of both defendants." Defendants contend that the bases for their stay applications is the fact that they were denied effective or independent legal counsel throughout the course of the criminal proceedings against them. In support of the motions, Mr. Resti filed virtually identical affidavits from defendants Barbour and Moran which outlined

complaints each had in connection with legal services rendered by attorneys Rossi and Campbell who originally represented them in these matters. Further, both defendants complained that they had not been adequately informed by the Court or examined pursuant to Fed.R.Crim.P. 44(c) regarding potential conflicts of interest on the part of attorney Cagnina in representing both of them at sentencing.[13] However, as referenced above, Mr. Resti filed a memorandum of law which was signed and submitted in his capacity as *defendant Barbour's counsel* in support of *both* defendants' stay applications. Mr. Resti hand-delivered these Orders and supporting papers to the Court where they were ultimately reviewed and signed by United States District Court Judge Munson. Judge Munson set the return date for the Orders to Show Cause for May 21, 2001.

On May 9, 2001, after reviewing defendants' applications, particularly the arguments related to Ms. Cagnina's alleged conflict of interest in representing both defendants, and recognizing that Mr. Resti was the only attorney who had made any formal appearance or filed any papers on behalf of either defendant, the Court con-

---

**13.** In discussing his alleged denial of effective assistance of legal counsel, defendant Barbour averred as follows:

Frankly, Mr. Rossi never involved himself in this case to any great degree, as evidenced not only by his total lack of involvement with discovery, but the results in this case. I retained him in the investigatory stage and was charged with and plead to the most serious count possible. The offense level that I was sentenced under was based on the so-called "intended loss", rather than the actual minimal loss to Nationwide. Although I was assured that the amount of loss would be a subject of a hearing at sentencing, Judge Mordue simply accepted the figures in the Pre–Sentence Report and sentenced me within the guideline range required by the intended loss. Interestingly, Mr. Rossi did not even

accompany me to the Probation interview or discuss my description of the offense conduct, resulting in a recommendation that I not be given a reduction for the Acceptance of Responsibility.

Ms. Cagnina, on the other hand, did as much as was possible given the situation. However, as I noted above, she had a significant structural problem in representation, since our interests were not necessarily aligned. Notwithstanding good intentions, however, my Sixth Amendment right to effective assistance of counsel was compromised.

Defendant Moran's contentions regarding her inadequate legal representation were identical with the sole exception that Ms. Campbell's name was substituted where Mr. Rossi's name appeared in the Barbour affidavit.

tacted both Mr. Resti and Ms. Cagnina. The Court advised counsel that in light of the papers which had clearly been both prepared and filed by Mr. Resti, either attorney Resti had to file a notice of appearance on behalf of defendant Moran or Ms. Cagnina had to file her own memorandum of law in support of defendant Moran's motion. In any case, the Court advised Mr. Resti that he could not submit the same memorandum of law on behalf of both defendants while purportedly representing only defendant Barbour. Two days later, on May 11, 2001, Ms. Cagnina filed a "Memoranda of Law" on behalf of defendant Moran which was in all meaningful respects identical to the "Memorandum of Law" prepared by Mr. Resti in support of defendant Barbour's motion and filed by Mr. Resti on behalf of both defendants.

On May 15, 2001, Ms. Cagnina wrote to the Court to advise that she had received notice that the return date on the Orders to Show Cause was May 21, 2001 and due to a "pre-planned trip," she would be unable to attend. According to Ms. Cagnina, the fact that the motions were made returnable on a date she knew she would be unavailable was because the "original application paperwork was submitted by James Resti, Esq. and [she] wasn't able to be present at the time."

Ms. Cagnina, Mr. Resti, both defendants and the Assistant United States Attorney assigned to this matter appeared for oral argument of these motions on May 29, 2001, at which time the Court explored at length defendants' ineffective assistance of counsel claims. On May 30, 2001, after hearing arguments from Ms. Cagnina regarding: 1) the alleged conflict of interest which prevented her from adequately rep-

resenting defendants at sentencing; 2) her acknowledgment that she was still representing defendants on appeal; and 3) her admission that in spite of the alleged conflict she had not requested that the Second Circuit relieve her as appellate counsel, the government filed a motion to disqualify Ms. Cagnina from further representation of defendants. It is with the above facts, procedural history and arguments of counsel as presented at the hearing in mind that the Court considers defendants' applications for stay of surrender based on the alleged legal infirmity of their sentences and/or the alleged constitutional deficiencies in the process by which they were sentenced.[14]

### III. Discussion

#### A. Applicable Standard

"A sentence of imprisonment shall be stayed if an appeal is taken from the conviction or sentence and the defendant is released pending disposition of appeal pursuant to Rule 9(b) of the Federal Rules of Appellate Procedure." Fed.R.Crim.P. 38(b). Fed. R.App. P. 9(b) states that "[a]pplication for release after a judgment of conviction shall be made in the *first instance in the district court.* If the district court refuses release pending appeal, or imposes conditions of release, the court shall state in writing the reasons for the action taken." Fed. R.App. P. 9(b) (emphasis added). The rules provide further:

The decision as to release pending appeal shall be made in accordance with Title 18, U.S.C. § 3143. The burden of establishing that the defendant will not flee or pose a danger to the community and that the appeal is not for the purpose of delay and raises a substantial

---

**14.** Defendants do not seek, at least not before this Court, to challenge, withdraw or question the validity of their guilty pleas.

question of law or fact likely to result in reversal or in an order for a new trial rests with the defendant.

Fed. R.App. P. 9(c). Finally, 18 U.S.C. § 3143(b), which is applicable here, provides in pertinent part as follows:

(1) ... [T]he judicial officer shall order that a person who has been found guilty of an offense and sentenced to a term of imprisonment, and who has filed an appeal ..., be detained, unless the judicial officer finds—

(A) by clear and convincing evidence that the person is not likely to flee or pose a danger to the safety of any other person or the community if released under section 3142(b) or (c) of this title; and

(B) that the appeal is not for the purpose of delay and raises a substantial question of law or fact likely to result in—

(i) reversal,

(ii) an order for a new trial, [or]

(iii) a sentence that does not include a term of imprisonment[.]

18 U.S.C. § 3143(b)(1).

The bases for defendants' applications to stay are that they were denied effective assistance of counsel in violation of their Sixth Amendment rights. To wit, defendants allege that attorneys Rossi and Campbell did not adequately represent their interests in the time period before and after their entry of guilty pleas and that attorney Cagnina had a conflict of interest in her joint representation which compromised her ability to effectively represent them at sentencing. A defendant advancing an ineffective assistance of counsel claim faces a considerable burden. To prevail, a defendant must demonstrate that his counsel's representation "fell below an objective standard of reasonableness." *Strickland v. Washington,* 466 U.S. 668, 688, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), and that "there is a reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different." *Kimmelman v. Morrison,* 477 U.S. 365, 381, 106 S.Ct. 2574, 91 L.Ed.2d 305 (1986). A defendant is not entitled to representation by a "modern-day Clarence Darrow"—mere competence will suffice. *United States v. Alessi,* 638 F.2d 466, 477 (2d Cir.1980).

■■■ Insofar as Ms. Cagnina's representation of defendants, short of a *per se* conflict of interest,[15] a defendant has suffered ineffective assistance of counsel in violation of the Sixth Amendment if his attorney has (1) a potential conflict of interest that resulted in prejudice to the defendant, or (2) an actual conflict of interest that adversely affected the attorney's performance. *See Winkler v. Keane,* 7 F.3d 304, 307 (2d Cir.1993) (citing *Strickland,* 466 U.S. at 688, 104 S.Ct. 2052; *United States v. Fulton,* 5 F.3d 605, 609 (2d Cir.1993)). An attorney has an actual conflict of interest "when, during the course of the representation, the attorney's and the defendant's interests diverge with respect to a material factual or legal issue or to a course of action." *Winkler,* 7 F.3d at 307 (citations omitted). A lapse of representation occurs when there is a "plausible alternative defense strategy" that is

---

**15.** A defense attorney has a *per se* conflict of interest with her client when she has "reason to fear that vigorous advocacy on behalf of h[er] client would expose h[er] to criminal liability or any other sanction," such that the interests of a defendant are necessarily compromised. *United States v. Jones,* 900 F.2d 512, 519 (2d Cir.1990) *cert. denied* 498 U.S. 846, 111 S.Ct. 131, 112 L.Ed.2d 99 (1990) (attorney faced with charges of suborning perjury by defendant had conflict of interest with his client). There is no allegation or evidence that Ms. Cagnina had a *per se* conflict of interest in this case.

inherently in conflict with or not undertaken because of an attorney's other loyalties or interests. *Id.* at 309; *United States v. Levy,* 25 F.3d 146, 157 (2d Cir.1994).

## B. Ineffective Assistance of Pre and Post Plea Defense Counsel

■ Defendants contend that they received inadequate representation from attorneys Rossi and Campbell who represented them up to and subsequent to the plea stage of these proceedings. In support of their argument, defendants allege the following: (1) Although Mr. Rossi advised both defendants that they required separate counsel and that defendant Moran retain Ms. Campbell, the defendants "rarely met with [their] respective counsel separately;" (2) for most of the criminal investigation the 144 insurance claim files in which defendant Barbour was alleged to have made fraudulent payments to MES "remained in the custody of Nationwide and were only available for review through the U.S. Attorney's Office at Nationwide;" [16] (3) defendants were presented with plea agreements prior to having the opportunity to conduct a review of the 144 files but accepted the agreements and plead guilty with the understanding that the amount of loss (which would determine

sentence) would be left to the Court to decide, leaving defendants "ample time to review the files and establish that nationwide's actual loss was minimal;" (4) when defendants were given the opportunity to review the claim files at Nationwide's office in June 2000 with their counsel, Mr. Rossi and Ms. Campbell disappeared mysteriously for four hours leaving defendants alone with the assistant U.S. Attorney and Postal Inspector; [17] (5) in September 2000, defendants were finally afforded the opportunity to review the claim files in the U.S. Attorney's Office after the government made arrangements for them to be transferred from Nationwide, but neither Mr. Rossi nor Ms. Campbell attended the review advising defendants that their presence was not necessary; (6) defendants contend that when they attempted to discuss their notes from the review on a file-by-file basis with counsel, neither Mr. Rossi nor Ms. Campbell were concerned or interested in this approach or in presenting such information to the Court; [18] and (7) defendants became "frustrated" with Mr. Rossi and Ms. Campbell resulting in their discharge of these attorneys and joint retention of Ms. Cagnina based on their financial inability to pay new separate counsel.[19]

16. Defendants allege that they repeatedly expressed concern to their counsel over the fact that they had not had the opportunity to review these files when such was "crucial to [their] defense." They were further concerned "that the files were in the custody of Nationwide, rather than the Government and hence subject to loss, etc.."

17. Defendants allege they were not able to review any files that day based on the absence of their counsel as well the computerized records which should have accompanied each claim file. However, defendants also acknowledge that the parties agreed to review the files at another time.

18. Indeed, defendant Barbour asserts that Mr. Rossi advised him to "categorize [the

files] and explain the problems on that basis," and that Barbour's "best chance on sentencing was to explain [his] conduct by some addiction, such as alcohol or gambling." In the case of Ms. Campbell, defendant Moran avers that her counsel "indicated she was not concerned with this issue [of the individual file review] and that [Moran] should focus more on [her] sick children."

19. Defendant Barbour also contends that Mr. Rossi failed to apprise the U.S. Attorney's Office of his interest in cooperating with the government to investigate and/or criminally charge Nationwide which defendant Barbour alleged "regularly and systematically engaged in illegal conduct." According to defendant Barbour, his "intention to cooperate was nev-

The Court finds that even assuming the truth of all of defendants' allegations regarding attorneys Rossi and Campbell, defendants have failed to establish lack of adequate legal representation by counsel. In the first instance, defendants do not allege, nor have they proven, that the actions of their original attorneys were detrimental to their defense, much less "unreasonable" under prevailing professional norms. *See Strickland,* 466 U.S. at 687, 104 S.Ct. 2052. For all their allegations regarding the delay in obtaining review of the insurance claim files, and the fact that the claim files were in the custody of Nationwide, defendants do not contend that they were unable ultimately to review the files and obtain necessary information from them or that any information or evidence in the files was withheld, lost or destroyed by Nationwide.[20]

Further, although defendants complain that attorneys Rossi and Campbell were "not interested" in discussing their file-by-file review in connection with presenting evidence to the Court on the amount of loss in this case, they do not allege what information or evidence the attorneys supposedly ignored nor do they state that either attorney failed to bring any particular information or evidence to the Court's attention. In addition to their failure to highlight specific and meaningful errors on the part of their counsel, defendants have not demonstrated that the outcome of the proceedings was affected by any such errors. *See id.* at 694, 104 S.Ct. 2052. When a claim of ineffective assistance of legal counsel is made, "[t]here is a strong presumption that an attorney's conduct

satisfied the constitutional minimum." *United States v. Aguirre,* 912 F.2d 555, 560 (2d Cir.1990). Short of establishing that any act or omission by attorneys Rossi and Campbell likely effected the type or length of their sentences, defendants allegations herein fail the *Strickland* analysis.

### C. Attorney Cagnina's Alleged Conflict of Interest

■ Defendants' other complaint on these motions is the Court's failure to follow the procedure outlined in Fed. R.Crim.P. 44(c), in advising them of their right to separate counsel after they jointly retained Ms. Cagnina to represent them at sentencing. Rule 44(c) states as follows:

> Whenever two or more defendants have been jointly charged pursuant to Rule 8(b) or have been joined for trial pursuant to Rule 13, and are represented by the same retained or assigned counsel or by retained or assigned counsel who are associated in the practice of law, the court shall promptly inquire with respect to such joint representation and shall personally advise each defendant of his right to the effective assistance of counsel, including separate representation. Unless it appears that there is good cause to believe no conflict of interest is likely to arise, the court shall take such measures as may be appropriate to protect each defendant's right to counsel.

Fed.R.Crim.P. 44(c). The rule "does not eliminate the defendant's power to waive his right to be represented by a conflict-free attorney." *United States v. Curcio,*

---

er imparted to the Government until just before sentencing when the Government had no interest in changing their [sic] position on [his] sentence."

**20.** Moreover, notably absent from defendants' discussion of the delay in obtaining review of the files is the fact that the government initial-

ly objected to defense counsel's request that it copy and/or make available all of the information in every claim file. Indeed, the dispute became the subject of a motion for a protective order which defense counsel opposed and effectively won.

680 F.2d 881, 887 (2d Cir.1982). "While the rule imposes on the trial court the duty to make prompt inquiries and to advise the jointly represented defendants as to their rights to separate representation, it does not forbid joint representation. It merely requires that *where a conflict may arise* 'the court shall take such measures as may be appropriate to protect each defendant's right to counsel.'" *Id.* (citing Fed. R.Crim.P. 44(c) (emphasis added)). "Given the constitutional dimension of the defendant's right to counsel of his own choosing, if the defendant makes a knowing and intelligent election to pursue that right in preference to his right to an attorney of undivided loyalty, disqualification would not protect the Sixth Amendment right that the defendant asserts and would not be 'appropriate.'" *Id.* at 888.

 Defendants contend that the Court's failure to conduct an inquiry on the record pursuant to Fed.R.Crim.P. 44(c) alone is grounds to stay surrender, presumably on the basis that the Second Circuit is likely to reverse the imposition of their sentences on appeal. The Court disagrees. "The Sixth Amendment requires automatic reversal only when a trial court fails to conduct an inquiry after either a timely conflict objection, ... or if the court 'knows or reasonably should know a particular conflict exists.'" *Levy,* 25 F.3d at 154 (quoting *United States v. Burney,* 756 F.2d 787, 791 (10th Cir.1985)) (internal quotation marks and citation omitted); *see also Hamilton v. Ford,* 969 F.2d 1006, 1011–12 (11th Cir.1992), *cert. denied,* 507 U.S. 1000, 113 S.Ct. 1625, 123 L.Ed.2d 183 (1993); *United States v. Crespo de Llano,* 838 F.2d 1006, 1012 (9th Cir.1987); *United States v. Cirrincione,* 780 F.2d 620, 625 (7th Cir.1985). In *Wood v. Georgia,* the Supreme Court stated that "*Sullivan* mandates a reversal when the trial court has failed to make an inquiry even though it *'knows or reasonably should know that a particular conflict exists."* 450 U.S. 261, 272 n. 18, 101 S.Ct. 1097, 67 L.Ed.2d 220 (1981) (citing *Cuyler v. Sullivan,* 446 U.S. 335, 347, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980) (emphasis added)). In the present case, there was no such conflict, nor did the Court have any reason to believe there could be one.

Defendants Barbour and Moran were represented by separate counsel at and long after the time they entered their pleas of guilty in this matter. The plea agreements settled any and all questions concerning the crime(s) defendants committed and their relative culpability. Defendants pled guilty to the same offense— *conspiracy* to defraud Nationwide through use of the mails in violation of 18 U.S.C. § 371—which by itself resolved all issues concerning defendants' individual conduct or involvement with the crimes charged. Further, both defendants stipulated to a two-level sentencing enhancement for "more than minimal planning." Defendant Barbour stipulated to an additional two-level enhancement for abuse of his position of employment at Nationwide. However, this enhancement had nothing to do with his conduct vis-a-vis defendant Moran's. By their pleas, defendants accepted joint and several liability for their acts.[21]

The only matters left unanswered by the plea agreements—and thus the only issues involved in Ms. Cagnina's representation of defendants—were: 1) the amount of loss that the collective acts by defendants, committed in furtherance of the conspira-

---

**21.** Accordingly, the Court's determination of the amount of loss in this case would never have turned on defendants' relative culpability or on the amount of money each took, received or attempted to take or receive via the conspiracy. Rather, the issue was the total amount of intended loss occasioned by the conspiracy.

cy, caused Nationwide;[22] 2) whether defendants would qualify for the "acceptance of responsibility" downward departure; and 3) whether any other personal circumstance of either defendant would be deemed mitigating. In connection with the first issue, there was no conceivable conflict between defendants. Any reduction in the amount of loss which could be proven by one defendant would only assist the other since they were sentenced based on the total amount of intended loss. Insofar as the second and third issues were concerned, these were individually driven by each defendant's family or other circumstances as well as willingness to accept responsibility for his or her own actions.

The strongest evidence demonstrating the absence of any conflict between defendants or lapse in their joint representation by Ms. Cagnina is their failure to allege, except in the most conclusory of terms, any *possible* prejudice which inured to them as a result of the Court's failure to officially apprise them of their right to separate counsel. *See United States v. Marrera*, 768 F.2d 201, 205 (7th Cir.1985) (when "trial court fails to inquire into [an alleged] conflict, a reviewing court will presume prejudice *upon a showing of possible prejudice*"), *cert. denied*, 475 U.S. 1020, 106 S.Ct. 1209, 89 L.Ed.2d 321 (1986). Here, defendants have wholly defaulted on their obligation to demonstrate that there was an actual or possible conflict which arose in their representation by attorney Cagnina and that their sentences were in any manner, however infinitesimal, affected by this conflict.

In their affidavits in support of the present motions, defendants make the identical statements concerning the Court's failure to conduct an inquiry regarding Ms. Cagnina's "potential" conflicts pursuant to Fed.R.Crim.P. 44(c). Both defendant Barbour and Moran aver "I subsequently learned that this conflict severely limited her representation of me, since she would, of necessity, have to put the interest of one client over another in arguing relative culpability." Later, both defendants argued that Ms. Cagnina had "a significant structural problem in representation since our interests were not necessarily alligned [sic]. Nothwithstanding [attorney Cagnina's] good intentions, ..., my Sixth Amendment right to effective assistance of counsel was compromised." Nowhere does either defendant identify the nature of the conflict or the basis of the "structural problem" in attorney Cagnina's joint representation, nor does either defendant even suggest Ms. Cagnina acted or failed to act on any fact, evidence, argument or possible avenue of defense for one of them out of concern for the other. Also notably absent from defendants' moving papers was an affidavit or affirmation from attorney Cagnina describing the alleged con-

---

**22.** Since the United States Sentencing Commission did not devise a specific sentencing guideline for a violation of 18 U.S.C. § 371, the applicable guideline is found in U.S.S.G. § 2X1.1, entitled "Attempt, Solicitation, or Conspiracy (Not Covered by a Specific Offense Guideline)." This provision states that the base offense level should be gleaned from the "base offense level from the guideline for substantive offense, plus any adjustments from such guideline for any intended offense conduct that can be established with reasonable certainty." Section 2F1.1 of the U.S.S.G. sets forth the base sentencing level for "Offenses Involving Fraud or Deceipt" and provides ascending increases in the base offense level for all losses over $2,000.00. For losses of more than $200,000.00 but less than $350,000.00, the required increase is 8 levels. Commentary 8 to this guideline states "[c]onsistent with the provisions of § 2X1.1 (Attempt, Solicitation or Conspiracy), if an intended loss that the defendant was attempting to inflict can be determined, this figure will be used if it is greater than the actual loss."

flicts which arose during her representation of defendants.

When pressed by the Court during oral argument of the present motions to provide some factual basis for the claim of prejudice or conflict between defendants, neither Mr. Resti nor Ms. Cagnina was able to articulate a satisfactory response. Mr. Resti first argued that because of attorney Cagnina's divided loyalty, his client, defendant Barbour, was not able to "adequately assert his own position at sentencing" concerning the amount of loss. However, as referenced above, this argument is specious since any fact or evidence which either defendant brought to the Court's attention concerning the amount of loss would have benefitted both of them. Mr. Resti also argued that defendant Barbour was denied the right to a hearing on the amount of loss to Nationwide which he contended was "minimal" and should have resulted in little or no jail time for both defendants. In the first instance, this argument does not appear to have any connection to the issue of attorney Cagnina's alleged conflict of interest. Secondly, although the Court had adjourned sentencing in this case for nearly a year to afford defendants all the time ever requested to review Nationwide's claim files and compile evidence on the issue of amount of loss, at the time of sentencing, there were no facts, no affidavits, no reports or statistics, no evidence—nothing—before the Court from either defendant or their attorney which controverted the loss figure reported by Nationwide or even suggested that there was a reason to conduct an evidentiary hearing in connection therewith. Finally, neither defendant nor any of their attorneys ever requested such a hearing on the record or in writing.[23]

The only other issue Mr. Resti raised during oral argument was the alleged inability of the defendants to "cooperate against each other" and to argue for a downward departure based on his or her "minor role in the offense" pursuant to U.S.S.G. § 3B1.2. When asked by the Court how defendant Barbour could possibly have played a minor role in the present offense, particularly in view of his having written each of the Nationwide checks in question, Mr. Resti could not think of anything "off the top of [his] head." However, he did say that he could think of some arguments on behalf of defendant Moran (even though he said he was not representing her) because unlike Barbour she had not received the two-level enhancement for abuse of a position of trust. Attorney Cagnina agreed that her client had not played as great a role in the conspiracy as evidenced by the absence of the additional enhancement. In the Court's view, this argument is untenable because the enhancement had nothing to do with defendant Barbour having played more of a role in the offense than defendant Moran or defendant Moran having played a lesser role than Barbour. The enhancement was based *solely* on Barbour's relationship with Nationwide and his abuse of that relationship of trust.

■ In any event, "a defendant is [only] entitled to a minor role adjustment if he can show, by a preponderance of the evidence, that he is 'less culpable than most other participants,' ... or 'played a minor role in comparison to the average participant in [a] crime.'" *United States v. Ajmal*, 67 F.3d 12, 18 (2d Cir.1995) (inter-

---

**23.** At oral argument of these motions, both attorney Resti and Ms. Cagnina insisted that defendants had been "denied" a hearing and that one was requested. A review of Ms. Cagnina's sentencing memoranda and the transcript of the April 4, 2001, sentencing hearing reveals no such request was ever made or denied.

nal citations and quotations omitted).[24] "However, '[the Second Circuit] has made clear that the Sentencing Commission intends for culpability to be gauged relative to the elements of the offense of conviction, not simply relevant to co-perpetrators." *Id.* A district court's assessment at sentencing "of the defendant's role in criminal activity is highly fact-specific and depends upon the nature of the defendant's relationship to other participants, the importance of the defendant's actions to the success of the venture, and the defendant's awareness of the nature and scope of the criminal enterprise." *United States v. Shonubi,* 998 F.2d 84, 90 (2d Cir.1993) (quotation omitted).

In the present case, the Court cannot conceive of a circumstance, nor could Mr. Resti or Ms. Cagnina articulate one, in which either defendant Barbour or defendant Moran could be deemed a minor or minimal participant in this conspiracy. Both defendants pled guilty to the same offense and both stipulated to a two-level enhancement for "more than minimal planning." Moreover, at the plea hearing in this case, both defendants acknowledged on the record that the government's recitation of their relevant offense conduct was accurate. Indeed, it is indisputable that the conspiracy herein could not have been launched ultimately without substantial, if not equal, participation by both defendants.[25] Neither defendant has demonstrated *any* evidence, much less a preponderance of evidence, which could have been

presented to the Court regarding his or her "minor role" in the offense but was not so presented based on the alleged conflict of interest afflicting Ms. Cagnina.

In rejecting defendants' arguments regarding bald issues or claims which "could have" been raised in their defense based on the absence of any facts or evidence which could conceivably have supported the claims, the Court does not misapprehend its obligations pursuant to Fed.R.Crim.P. 44(c). Nor does the Court doubt that in numerous other scenarios, the failure of the Court to conduct a specific inquiry of jointly represented defendants regarding their understanding of the right to separate counsel would have impaired their Sixth Amendment rights. However, in this case, involving these defendants and this crime, no such impairment occurred. Indeed, the Court is certain that the present applications by defendants are nothing more than an ill-conceived, last grasp, desperate effort to delay their inevitable imprisonment.

Unsettling to the Court is the deceptive manner in which defendants have attempted to capitalize on the Court's admitted failure to conduct the 44(c) inquiry. Consider, for example, that when Ms. Cagnina elected to apply to the Second Circuit for a stay in this case rather than first making the request before this Court as the law requires, she made no reference whatsoev-

---

**24.** Indeed, "[i]t is intended that the downward adjustment for a minimal participant will be used infrequently." Commentary to U.S.S.G. § 3B1.2. For example, it would be appropriate "for someone who played no other role in a very large drug smuggling operation than to offload part of a single marihuana shipment, or in a case where an individual was recruited as a courier for a single smuggling transaction involving a small amount of drugs." For purposes of U.S.S.G. "a minor participant means any participant who is less

culpable than most other participants, but whose role could not be described as minimal." Commentary to U.S.S.G. § 3B1.(b).

**25.** To wit, a plan to defraud an insurance company by making bogus payments on claim files to an outside service provider necessarily requires someone on the inside to write the checks and someone on the outside to receive and cash them.

er to the issue of her joint and thus allegedly ineffective representation of defendants. If she had, the Circuit clearly would not have assigned her to represent both defendants on appeal. Yet Ms. Cagnina appeared before this Court in her capacity as appellate counsel for defendants, having made no move to be relieved since being so appointed on May 4, 2001, and asserted that she had encountered conflicts in her representation of defendants prior to sentencing. In connection with this issue, Ms. Cagnina argued to the Court that by the time she discovered the alleged but as yet undescribed conflicts, it was "too late" to do anything about them. She claimed that she failed to bring the problem to Court's attention or request further time before sentencing because of "the Court's obvious agitation and concern about the numerous adjournments that were granted to these defendants." In Ms. Cagnina's estimation "obviously there was a problem with [her] asking for another adjournment for another attorney to be appointed." The source of the alleged "agitation and concern" on the part of the Court is a mystery, however, since the record reflects that the Court granted every adjournment requested and at no point suggested it would not grant further delays upon good cause shown. Incredibly, even after allowing the sentencing to proceed in spite of such allegedly grave difficulties in fulfilling her legal and ethical duties to her clients, it apparently never occurred to Ms. Cagnina, a licenced attorney admitted to practice in 1994, to bring the issue of her divided loyalty to the attention of the Second Circuit after the court appointed her to perfect defendants' appeals. Indeed, due to Ms. Cagnina's failure to take any action to prevent further detriment to defendants based on her alleged conflict of interest, the government took it upon itself to file a motion to relieve

her as counsel following oral argument on these motions.

Mr. Resti's actions in this case are equally unsettling. After discovering that the Court had not followed the procedure set forth in Fed.R.Crim.P. 44(c), Mr. Resti prepared papers on behalf of *both* defendants complaining that their constitutional rights had been violated due to their having been represented by the same attorney at sentencing. Mr. Resti then presented the Orders to Show Cause to Judge Munson on behalf of both defendants and obtained the current stay on behalf of both defendants. The only reason that Ms. Cagnina made any formal written appearance on these motions is because the Court ordered her to file a separate memorandum of law on behalf of defendant Moran if she intended to represent her in the proceedings. Following this order, Ms. Cagnina proceeded to change the title and some of the wording in the "Memorandum of Law" prepared by Mr. Resti on behalf of defendant Barbour to a "Memoranda of Law" which she signed on behalf of defendant Moran but which was, in all meaningful respects, still Mr. Resti's work.

When pressed by the Court to state what papers or arguments, if any, of Ms. Cagnina's were before Judge Munson when he signed the Orders to Show Cause, Ms. Cagnina stated she couldn't "recall" if the papers she prepared were submitted to Judge Munson because she "wasn't there." Mr. Resti stated that Ms. Cagnina had "participated in preparing" the papers submitted by Mr. Resti. Ms. Cagnina told the Court that it was her "intention to adopt the Memorandum of law to present that on [Moran's] behalf along with her affidavit and to present an affidavit." This, however, was never done since the papers before Judge Munson were virtually identical for both defendants and submitted only by Mr. Resti. Of particular interest was Mr. Resti's comment that there was nothing

wrong with submitting a common memorandum for both defendants since "it would have said the same thing, frankly."

Highlighting Ms. Cagnina's apparent uninvolvement in the filing and presentation of the present motions was the fact that Judge Munson scheduled the hearing for a date that Ms. Cagnina would be out of town on a "pre-planned trip" and yet she did not advise the Court of her need for an adjournment until May 15, 2001, after receiving notification from the Clerk's office that the motion return date was May 21, 2001. The point of course is that defendants Barbour and Moran allege that they were denied effective assistance of counsel based on joint representation by Ms. Cagnina at sentencing yet they have not to date objected to Ms. Cagnina's joint representation of them on appeal nor have they opposed Mr. Resti's *de facto* joint representation of them on these motions.

So the question remains—where is the conflict? Defendant Barbour is a licenced attorney himself and presumably well-versed in the protections afforded by the Sixth Amendment. Defendant Moran is also an educated professional with, by her own admission, substantial experience with lawyers and legal matters. In spite of the alleged diametric interests they had in connection with sentencing, both defendants signed an acknowledgment and waiver of the possibility that their attorney of choice [26] had a conflict or apparent conflict of interest in jointly representing them. Based on the unique circumstances presented by this case and the absolute failure of either defendant to demonstrate any appreciable prejudice or even possible prejudice which inured to him or her based on allegedly ineffective representation by

their original attorneys or the Court's failure to conduct a Fed.R.Crim.P. 44(c) hearing, the Court is not persuaded that defendants are likely to prevail on appeal. Based thereupon, they are not entitled to a stay of sentence. Moreover, even if the Circuit views this case differently and remands for resentencing, it is virtually implausible based on the facts currently available to the Court that defendants will receive sentences that do not include terms of imprisonment.

## IV. Conclusion

Based on the foregoing, defendants' motions to stay execution of their sentences of imprisonment pending appeal are DENIED. As a further matter, the Court notes it is without jurisdiction to act on defendants' applications for *in forma pauperis* status and appointment of counsel since the Second Circuit has already issued an order assigning Ms. Cagnina as appellate counsel and the government has moved that court to relieve her of said representation. Based thereupon, it is hereby

**ORDERED** that defendant Paul R. Barbour shall surrender for service of sentence at the institution designated by the Bureau of Prisons before 2 p.m. on Monday, June 11, 2001; and it is further

**ORDERED** that defendant Kellie A. Moran shall surrender for service of sentence at the institution designated by the Bureau of Prisons before 2 p.m. on Monday, June 11, 2001.

**IT IS SO ORDERED.**

---

**26.** The fact that defendants retained Ms. Cagnina is notable only insofar as defendants assert that they were forced to hire the same attorney due to "exhaustion" of their financial resources rather than a tactical decision to align their interests concerning sentencing. At no time prior to sentencing did defendants ever make any request for appointment of counsel.