**UNITED STATES of America, Appellee,**

v.

**Timothy M. MUCCIANTE, Defendant–Appellant.**

**No. 1039, Docket 93–1155.**

United States Court of Appeals, Second Circuit.

Argued Feb. 10, 1994.

Decided April 15, 1994.

**1230**

Leonard J. Levenson, New York City, for defendant-appellant.

Nancy Northup, Asst. U.S. Atty., S.D.N.Y. (Mary Jo White, U.S. Atty., S.D.N.Y., Paul G. Gardephe, Asst. U.S. Atty., S.D.N.Y. of counsel), for appellee.

Before: LUMBARD, MINER and McLAUGHLIN, Circuit Judges.

McLAUGHLIN, Circuit Judge:

Timothy M. Mucciante, a Detroit lawyer, concocted two fanciful investment fraud schemes in the late 1980s. His first scam was relatively modest: he created counterfeit Australian government bonds using his personal computer, and then passed them off as legitimate. His second swindle was picaresque: Mucciante solicited investments for a phantom business venture to barter millions of British condoms in exchange for Russian chickens. He claimed that the chickens could then be sold to Saudi Arabia, yielding a substantial profit for the investors. After his frauds came to light, Mucciante was arrested and charged with a host of federal crimes.

Following a seven-week trial in the United States District Court for the Southern District of New York before then-District Judge Pierre N. Leval, the jury convicted Mucciante on four counts of passing counterfeit foreign government bonds, in violation of 18 U.S.C. §§ 479 and 2, eight counts of wire fraud, in violation of 18 U.S.C. §§ 1343 and 2, and two counts of transporting the proceeds of fraud in interstate commerce, in violation of 18 U.S.C. §§ 2314 and 2. Judge Leval sentenced Mucciante to seventy-one months' imprisonment, to be followed by a three-year term of supervised release, $973,538 in restitution, a $50,000 fine, and a mandatory $750 special assessment.

On appeal, Mucciante's central argument is that Judge Leval's supplemental jury instructions constructively amended his indictment. Mucciante maintains that his indictment was drawn narrowly, and restricted the government to proving his culpability as a principal in the fraud; he argues that Judge Leval's jury charge impermissibly broadened the basis for conviction by allowing the jury to convict him as an aider and abettor in the fraud. Alternatively, Mucciante contends that the government's presentation of evidence constituted a prejudicial variance. Finally, Mucciante challenges his sentence, arguing that Judge Leval's calculation of "loss" under U.S.S.G. § 2F1.1 was clearly erroneous.

We conclude that there was neither a constructive amendment to the indictment nor a prejudicial variance between the indictment and the proof at trial. We also conclude that the calculation of the loss was proper. Accordingly, we affirm.

## BACKGROUND

In the late 1980s, Timothy Mucciante was a young lawyer associated with a Detroit, Michigan law firm. Among Mucciante's clients was the celebrated Dr. Stuart M. Berger, a New York diet doctor, radio talk-show host, *New York Post* columnist and best-selling author of nutrition books. Mucciante counseled Berger on a variety of business ventures to develop and market vitamins and nutritional products. Mucciante acted not only as Berger's lawyer, but also as his promoter and trusted business adviser. In exchange for his services, Mucciante received a percentage of Berger's profits. To facilitate their business dealings, Berger gave Mucciante access and signature authority to some of Berger's bank and brokerage accounts.

### A. *The Australian Bond Scheme*

In 1989, Mucciante advised Berger to invest in Australian government bonds, falsely representing that these bonds yielded 17.9 percent interest, were tax-free and offered pre-paid interest. On Mucciante's advice, Berger instructed his New York City broker, Gruntal & Co. ("Gruntal"), to send Mucciante a check for $1.6 million to purchase a bond. Mucciante deposited the check into one of Berger's bank accounts over which Mucciante had signature authority. In fact, Mucciante never bought the bond. When Berger asked Mucciante for his promised pre-paid interest, Mucciante simply withdrew $143,200 from Berger's own $1.6 million and delivered the cash to Berger.

After receiving his "interest" payment, Berger returned $50,000 of it to Mucciante with instructions to buy another Australian bond. Mucciante falsely told Berger that he combined that $50,000 with another $10,000 of Berger's money to purchase a $60,000 Australian bond. In February 1990, Berger instructed Gruntal to wire $1 million into one of Berger's brokerage accounts (again, an account controlled by Mucciante) so that Mucciante could buy him a third bond. And again, Mucciante falsely told Berger that he bought the bond. Mucciante also falsely told Berger that he bought him a fourth bond

using $600,000 in profits from an unrelated business venture.

Ultimately, Berger pressed Mucciante to deliver the actual bonds to him for deposit into Berger's brokerage account at Gruntal. After some stalling, Mucciante responded with characteristic creativity to what was obviously an impossible request. He manufactured counterfeit Australian bonds on his personal computer; for authenticity, he added ribbons and wax. Mucciante delivered the bogus bonds to Berger, who deposited them with Gruntal.

### B. *The Condom Scheme*

Around the same time, Berger appointed Mucciante general counsel for the Areba Casriel Institute ("ACI"), a drug and alcohol rehabilitation center in New York City. ACI was owned by Berger, Alan R. Horowitz and Steven J. Yohay (collectively, the "Investors"). Mucciante proposed to the Investors that they capitalize on ACI's reputation in health care by selling AIDS-related medical products—such as condoms and latex gloves—to the Soviet Union.

Mucciante told the Investors that the Soviets lacked "hard" currency, but were willing to barter chickens in exchange for the condoms and gloves. The chickens, he explained, could then be sold to Saudi Arabia. He predicted that the deal would yield a profit of around $3 million. Mucciante somehow convinced the Investors to entrust him with a total of $75,000, ostensibly as a down payment to the London Rubber Company for two million condoms and two million latex gloves. In fact, Mucciante deposited the Investors' money into his personal brokerage account and never placed the order.

The Investors soon began clamoring to see some return on their investment. Mucciante responded that they would each receive as much as $600,000—as soon as the Saudis released the chickens from quarantine. When pressed, Mucciante sent each investor $25,000, which Mucciante characterized as an initial return on their investment. In fact, Mucciante paid the Investors with money from one of Berger's bank accounts.

In March 1990, both the condom scheme and the Australian bond scheme fell apart when a broker at Gruntal discovered that the bonds Berger had deposited were fake.

## C. *The Indictment*

In 1991, a federal grand jury returned a 23–count indictment charging Mucciante with the two fraud schemes. Because the particulars of Mucciante's indictment are the focus of this appeal, we describe the indictment in some detail.

The first nine counts of Mucciante's indictment related to the Australian bond scheme. Counts 1 through 3 charged Mucciante with committing wire fraud, in violation 18 U.S.C. §§ 1343 and 2; counts 4 and 5 charged him with transporting the proceeds of the bond fraud in interstate commerce, in violation of 18 U.S.C. §§ 2314 and 2; and counts 6 through 9 charged the passing of counterfeit foreign government bonds, in violation of 18 U.S.C. §§ 479 and 2.

The next three counts of the indictment accused Mucciante of illegally covering up his frauds. Specifically, counts 10 and 11 charged him with obstructing justice, in violation of 18 U.S.C. §§ 1503 and 2; and count 12 charged him with witness tampering, in violation of 18 U.S.C. § 1512.

The last eleven counts of the indictment covered the condom scheme. Counts 13 through 21 charged Mucciante with committing wire fraud, in violation of 18 U.S.C. §§ 1343 and 2; and counts 22 and 23 charged him with transporting the proceeds of the condom fraud in interstate commerce, in violation of 18 U.S.C. §§ 2314 and 2. Significantly, all the counts of Mucciante's indictment, except the witness tampering count, charged him with violating 18 U.S.C. § 2, the federal aiding and abetting statute.

## D. *The Trial*

At trial, the government basically argued that Mucciante defrauded Berger in the Australian bond scheme, and defrauded Berger, Horowitz and Yohay in the condom scheme. Mucciante's defense was that Berger himself was the con artist, and that Mucciante, at most, assisted the "domineering" Berger.

Regarding the Australian bond scheme, for example, defense counsel argued in summation that Mucciante did not defraud Berger; rather, Mucciante *and* Berger defrauded Berger's broker, Gruntal, with the fake bonds.

Apparently, Mucciante's defense struck a sympathetic chord with some members of the jury. During the eight days of deliberations, the jury sent out several notes suggesting that it suspected Berger of complicity in the frauds. For example, one note posed the following hypothetical:

> If A is charged with a criminal offense against B, but B is suspected of complicity in the offense, can A be found guilty?

Judge Leval answered that it would depend on which crimes they are considering. For the wire fraud and interstate transfer counts relating to the Australian bond scheme (counts 1–5), he explained that the government must prove that Mucciante defrauded someone; and, because the indictment specified Berger as the victim of that wire fraud, the government had to prove that Mucciante defrauded Berger. Accordingly, Judge Leval charged that if the jury believed that Berger and Mucciante were partners in the Australian bond scheme, then it could not convict on counts 1–5.

In contrast, for the counts charging Mucciante with passing the counterfeit bonds (counts 6–9), Judge Leval instructed the jury that it could convict Mucciante even if Berger was the principal:

> As to Counts 6 through 9, the answer is somewhat different. The criminal statute involved in Counts 6 through 9 punishes the uttering or passing of counterfeit bonds with intent to defraud. This statute seeks to protect the marketplace from being polluted by counterfeit securities....
>
> There is an important difference between uttering counterfeit securities and fraudulently selling, for example, a nonexistent oil well. If a person with fraudulent intent sells a nonexistent oil well to X, X will be defrauded, but that will be the end of the fraud. On the other hand, when one places counterfeit securities into the stream of commerce, the effect of the

fraud continues as the securities are passed eventually from purchaser to purchaser....

Thus the offense charged here in Counts 6 through 9 do not, as in Counts 1 through 5, depend on intent to defraud Dr. Berger.... [S]o long as there was an intent to defraud on the part of the defendant, it does not matter whether the defendant intended to defraud Dr. Berger or whether the defendant intended to help Dr. Berger defraud others by passing the bonds into the stream of commerce in business transactions.

Judge Leval later clarified this instruction, explaining that Mucciante could be guilty either as the principal of the bond scheme, or as an aider and abettor of Berger's scheme.

Judge Leval also gave supplemental instructions on the condom fraud counts (counts 13–23), explaining that the jury could convict Mucciante even if it believed one of the Investors (presumably Berger) was not in fact victimized. He cautioned, however, that "the defendant cannot be found guilty unless the jury finds beyond a reasonable doubt that he intended to defraud either Berger or Yohay or Horowitz." Judge Leval further charged that the jury must be unanimous on at least one victim.

### E. The Verdict

The jury acquitted Mucciante on counts 1–5, apparently accepting Mucciante's story that Berger was his accomplice, not his victim. The jury also acquitted Mucciante of obstructing justice and witness tampering.

The jury convicted Mucciante, however, of passing the counterfeit bonds (counts 6–9). It also found him guilty on all counts relating to the condom fraud scheme (counts 13–23).

### F. Sentencing

Judge Leval sentenced Mucciante to a term of 71 months in prison. This sentence reflected a finding under U.S.S.G. § 2F1.1 that Mucciante's schemes involved a "loss" of between $2.5 and $5 million. In addition, Judge Leval ordered that Mucciante pay Berger restitution of $973,538 to compensate Berger for his actual losses.

Mucciante now appeals.

## DISCUSSION

### I. Constructive Amendment

Mucciante's primary argument on appeal is that Judge Leval's supplemental jury instructions constructively amended the indictment. We are not persuaded.

The Grand Jury Clause of the Fifth Amendment provides that "[n]o person shall be held to answer for a capital, or otherwise infamous crime, unless upon a presentment or indictment of a Grand Jury." U.S. Const. amend. V. Consistent with the Grand Jury Clause, a defendant may be tried and convicted only on those charges contained in the indictment returned by a grand jury. *See Stirone v. United States*, 361 U.S. 212, 217, 80 S.Ct. 270, 273, 4 L.Ed.2d 252 (1960); *United States v. Helmsley*, 941 F.2d 71, 89 (2d Cir.1991), *cert. denied*, —— U.S. ——, 112 S.Ct. 1162, 117 L.Ed.2d 409 (1992); *United States v. Smith*, 918 F.2d 1032, 1036 (2d Cir.1990), *cert. denied*, 498 U.S. 1125, 111 S.Ct. 1086, 112 L.Ed.2d 1191 (1991). Once the grand jury returns an indictment, only the grand jury may lawfully amend that indictment. *Stirone*, 361 U.S. at 218–19, 80 S.Ct. at 273–74.

Even if an indictment is not *actually* amended, the law recognizes that there are times when the government's presentation of evidence, together with the trial court's jury instructions, creates an unacceptable risk that the jury might convict the defendant of a crime materially different from the one alleged in the indictment. An indictment is *constructively* amended when its terms " 'are in effect altered by the presentation of evidence and jury instructions which so modify essential elements of the offense charged that there is a substantial likelihood that the defendant may have been convicted of an offense other than that charged in the indictment.' " *United States v. Mollica*, 849 F.2d 723, 729 (2d Cir.1988) (quoting *United States v. Hathaway*, 798 F.2d 902, 910 (6th Cir.1986); *see also United*

*States v. Roshko,* 969 F.2d 1, 5 (2d Cir.1992). Where an appellate court finds that the indictment has been constructively amended, there is a *per se* violation of the Grand Jury Clause and the conviction on the amended counts must be reversed. *See United States v. Coyne,* 4 F.3d 100, 112 (2d Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 929, 127 L.Ed.2d 221 (1994); *Helmsley,* 941 F.2d at 89.

## A. *The Australian Bond Scheme*

■ Counts 6 through 9 of Mucciante's indictment charged him with passing counterfeit Australian bonds. Mucciante believes that his indictment was drawn with such specificity that it restricted the government to proving that Mucciante defrauded Berger with the bonds. Mucciante reasons that Judge Leval's aiding and abetting instruction permitted the jury to convict Mucciante even if the jury believed Berger was *not* the victim of that scheme, but was, in fact, its mastermind. He argues, therefore, that his indictment was constructively amended because the aiding and abetting instruction allowed the jury to convict him of a crime not charged in the indictment. Like his phantom investment schemes, Mucciante's argument has surface appeal but is wholly lacking in substance.

■ We begin with the general observation that the inclusion of an aiding and abetting charge to the jury will rarely, if ever, constructively amend an indictment because an aiding and abetting charge is arguably implicit in every indictment. *See United States v. Sabatino,* 943 F.2d 94, 99–100 (1st Cir.1991). The federal aiding and abetting statute, 18 U.S.C. § 2, does not penalize conduct apart from the substantive crime with which it is coupled. *See, e.g., United States v. Kegler,* 724 F.2d 190, 200 (D.C.Cir.1984). Accordingly, it is well established that a trial judge may properly give an aiding and abetting instruction even if the indictment does not expressly charge a violation of 18 U.S.C. § 2. *See, e.g., United States v. Mayo,* 14 F.3d 128, 132–33 (2d Cir.1994); *United States v. Damsky,* 740 F.2d 134, 140 (2d Cir.), *cert. denied,* 469 U.S. 918, 105 S.Ct. 298, 83 L.Ed.2d 233 (1984); *United States v.*

*Taylor,* 464 F.2d 240, 241 n. 1 (2d Cir.1972). *See also United States v. Smith,* 727 F.2d 214, 217 (2d Cir.1984) ("An aiding and abetting jury instruction is appropriate where the prosecution makes it known that it intends to proceed on a theory of aiding and abetting and the evidence so warrants.").

That said, we note that in any event Mucciante's indictment *expressly* charged him with violating 18 U.S.C. § 2. The indictment cited that statute in all counts except the witness tampering count, and, therefore, Mucciante was on actual notice that he could be convicted of aiding and abetting another person in the passing of counterfeit bonds. He cannot seriously contend that his indictment was amended by the addition of an aiding and abetting instruction. *Accord United States v. Robinson,* 956 F.2d 1388, 1394–95 (7th Cir.) ("If 18 U.S.C. § 2 is charged in the indictment, the defendant is put on notice that he can be convicted as an aider and abettor. Because a violation of 18 U.S.C. § 2 was charged in the indictment, appellants can neither claim an amendment to the indictment nor unfair surprise."), *cert. denied,* —— U.S. ——, 113 S.Ct. 654, 121 L.Ed.2d 581 (1992).

The reference to 18 U.S.C. § 2 in the indictment does not end our inquiry, however. It has been recognized that an indictment might be drawn with such specificity as to restrict the government to proving an essential element of the offense through a particular set of facts. *See, e.g., United States v. Zingaro,* 858 F.2d 94, 100–101 (2d Cir.1988). If a fraud indictment, for example, restricted the government to proving that a particular person was defrauded, it may well be that a jury charge that permitted a conviction for defrauding a different victim would constructively amend that indictment. Whatever the merits of that argument, however, Mucciante's indictment cannot fairly be read to restrict the government to proving that Mucciante defrauded Berger with the counterfeit bonds.

First, constructive amendment occurs only when the proof or the jury charge modifies "an *essential element* of the offense charged." *United States v. Weiss,* 752 F.2d 777, 787 (2d Cir.1985). In this case, however,

Mucciante may be found guilty of uttering counterfeit foreign government bonds regardless of whether anyone was, in fact, defrauded.

■ The counterfeit bond statute, 18 U.S.C. § 479, makes it illegal to "knowingly and with intent to defraud, utter[ ], pass[ ], or put[ ] off, in payment or negotiation, any false, forged, or counterfeited [foreign government bond.]" Although section 479 requires proof that the defendant passed counterfeit bonds "knowingly," and that he did so "with intent to defraud," the intent element of the offense is satisfied so long as Mucciante possessed "a general intent that some innocent third party in the chain of distribution be defrauded." *United States v. Anzalone*, 626 F.2d 239, 244 (2d Cir.1980) (interpreting identical language in 18 U.S.C. § 472).

Passing counterfeit government bonds is by no means a "victimless crime"; but section 479 simply does not require the government to identify and prove that a particular person in the chain of distribution was, in fact, defrauded. Accordingly, even if we were to read the indictment to specify Berger as a victim, contrary evidence adduced at trial would not modify an "essential element" of the crime.

Furthermore, the allegations in Mucciante's indictment, fairly read, do not restrict the government to proving that Berger was defrauded by the counterfeit bonds. Counts 6 through 9 are contained in Paragraphs 17 and 18 of Mucciante's indictment.[1] Paragraph 18 of the indictment closely tracks the language of the statute. Contrary to Mucciante's characterization, however, these paragraphs do not identify Berger as the victim of that crime, let alone its *only* victim.

We acknowledge that Paragraph 17 contains boilerplate language that "repeated and realleged" earlier background paragraphs. We are also aware that the incorporated background paragraphs describe how Mucciante "gave" the counterfeit bonds to Berger. Nevertheless, because the allegations that Mucciante gave Berger the counterfeit bonds need not be proved to convict Mucciante of violating section 479, they cannot fairly be read to limit the basis for convicting Mucciante under counts 6 though 9. *See United States v. Miller*, 471 U.S. 130, 136–38, 105 S.Ct. 1811, 1815–16, 85 L.Ed.2d 99 (1985); *United States v. Attanasio*, 870 F.2d 809, 816 (2d Cir.1989).

### B. *The Condom Scheme*

■ Regarding the condom scheme (counts 13–23), Mucciante argues that while the grand jury indicted him for defrauding Berger, Horowitz *and* Yohay, Judge Leval's supplemental instructions improperly permitted the jury to convict him of defrauding any one of the three. Mucciante complains that Judge Leval's supplemental charge permitted the jury to convict him of the condom scheme even if Berger was not one of the victims of that scheme. He claims that such an instruction added a "new theory" of criminal liability not charged in the indictment. We do not see how Judge Leval's instructions added anything to the scope of the indictment.

In *United States v. Miller*, 471 U.S. 130, 105 S.Ct. 1811, 85 L.Ed.2d 99 (1985), the Supreme Court distinguished the doctrine of constructive amendment (where the proof adduced at trial expands the basis of the indictment) from cases in which "a defendant is tried under an indictment that alleges a certain fraudulent scheme but is convicted based on trial proof that supports only a significantly narrower and more limited, though included, fraudulent scheme." *Id.* at 131, 105 S.Ct.

---

1. In relevant part, the indictment reads as follows:

*Counts Six Through Nine*
The grand jury further charges:
17. The allegations of paragraphs one through thirteen of this Indictment are repeated and realleged as though fully set forth in these counts.
18. On or about the dates set forth below, in the Southern District of New York, TIMOTHY M. MUCCIANTE, the defendant, unlawfully, wilfully, knowingly and with intent to defraud, uttered, passed and put off, in payment and negotiation, false, forged, and counterfeited bonds of a foreign government ... namely, the following documents purporting to be bearer bonds of the Commonwealth of Australia: [listing the counterfeit bonds].

at 1812. The Court held that a defendant's constitutional rights are not violated when a jury convicts a defendant for a narrower, though included, fraudulent scheme. *Id.* Here, counts 13 through 23 charged Mucciante with defrauding Berger, Yohay and Horowitz. Judge Leval instructed the jury that it could convict Mucciante for defrauding any one of the three, so long as it agreed on which one. This was entirely proper under *Miller.*

In sum, we reject Mucciante's argument that the supplemental instructions added either a "new victim" or a "new theory" to the case. Because nothing new was added to Mucciante's indictment, it was not unconstitutionally "broadened." *Miller,* 471 U.S. at 139, 105 S.Ct. at 1816.

## II. *Prejudicial Variance*

Mucciante argues in the alternative that even if the evidence of Berger's complicity did not constructively amend his indictment, it, at least, constituted a prejudicial variance. Again, we disagree.

"A variance arises when the evidence adduced at trial establishes facts different from those alleged in an indictment." *Dunn v. United States,* 442 U.S. 100, 105, 99 S.Ct. 2190, 2193, 60 L.Ed.2d 743 (1979). "Whereas a constructive amendment *per se* violates the grand jury guarantee of the fifth amendment, a variance violates this guarantee only when the defendant can demonstrate prejudice." *Attanasio,* 870 F.2d at 817. A variance is immaterial—and hence not prejudicial—"where the allegation and proof substantially correspond, where the variance is not of a character that could have misled the defendant at the trial, and where the variance is not such as to deprive the accused of his right to be protected against another prosecution for the same offense." *United States v. Heimann,* 705 F.2d 662, 669 (2d Cir.1983).

Mucciante's reliance on the doctrine of variance is entirely misplaced. The indictment charged Mucciante with aiding and abetting; proof that Mucciante aided and abetted fleshed out the allegations of the indictment. Nor can Mucciante complain that he was misled, since the evidence of Berger's complicity was introduced largely by Mucciante himself. Almost by definition, evidence offered to disprove the charges in the indictment will alter the facts alleged therein. But such a variance cannot possibly prejudice the defendant.

Although we hesitate to draw inferences from the jury's verdict, we believe it apparent that the evidence suggesting Berger's complicity actually benefitted Mucciante: The jury acquitted him on those counts (counts 1–5) which required a finding that Berger was a victim. Finally, Mucciante is in absolutely no danger of a subsequent conviction for aiding and abetting Berger. Accordingly, evidence that Berger was not defrauded does not constitute prejudicial variance.

Relying primarily on *United States v. San Juan,* 545 F.2d 314 (2d Cir.1976), Mucciante argues that his conviction cannot stand because his defense was fatally undermined by the timing of the aiding and abetting charge. At the charging conference, Judge Leval struck the aiding and abetting instruction requested by the government, apparently believing that this was not a "classic" case of aiding and abetting. It was not until the jury's note inquired about the legal significance of Berger's complicity that Judge Leval reversed himself and gave the requested instruction. We fail to see how this turn of events hindered Mucciante's defense.

In *San Juan,* Mrs. San Juan was charged with willfully failing to report $77,500 which she was carrying into the United States by bus. While on the bus, she failed to report to a customs inspector that she was bringing in cash in excess of $5,000, as required under the statute. Suspicious, the inspector asked Mrs. San Juan to accompany him to a customs house, where officials presented her with the necessary form to report the money. She again failed to report the money.

Although her indictment charged her with failing to report the money, it did not specify whether the failure occurred (1) on the bus, or (2) at the customs house. At trial, both the government and the defense proceeded on the theory that the crime occurred on the bus. The court's charge, however, left room

for the jury to convict her even it found that the crime occurred at the customs house. Without invoking either constructive amendment or variance doctrine, we reversed Mrs. San Juan's conviction because "the manner in which th[e] case was tried worked a fundamental unfairness." *San Juan*, 545 F.2d at 314. We stressed that the defendant was effectively denied an opportunity to address the accusation that the crime occurred in the customs house. *Id.* at 319.

We see no such "fundamental unfairness" resulting from Judge Leval's decision to add an aiding and abetting instruction in his supplemental instructions. Mucciante's indictment charged him with violating 18 U.S.C. § 2. In addition, the government's Request to Charge included a proposed aiding and abetting instruction, an instruction to which Mucciante never objected. Judge Leval's *sua sponte* decision at the charging conference to strike the instruction did not occur until the defense case was completed. From the outset, therefore, Mucciante was fully aware of the possibility that Judge Leval would give the requested instruction. Neither the trial court nor the government can be faulted if defense counsel failed to conduct his defense accordingly.

True, the aiding and abetting instruction was stricken before summations. Nevertheless, we do not see any prejudice on this record. Mucciante "never requested the opportunity to have additional argument. Nor did he argue to the district court that his closing argument would have been different had he known the modified instruction was to be given." *United States v. James*, 998 F.2d 74, 79 (2d Cir.1993). Unlike Mrs. San Juan, therefore, Mucciante was not effectively denied an opportunity to defend against all the charges against him.

Accordingly, we affirm Mucciante's conviction.

### III. *Sentencing*

Section 2F1.1 of the Sentencing Guidelines—applicable to offenses involving fraud and deceit, as well as offenses involving altered or counterfeit instruments—provides for an enhancement to the base offense level depending on the amount of "loss" resulting from the fraudulent scheme. Judge Leval increased Mucciante's offense leval by 13, based on a loss of $2,650,000, the total sum Mucciante fraudulently induced Berger to place under his control. *See* U.S.S.G. § 2F1.1(b)(1)(N) (applicable to a loss greater than $2.5 million but less than $5 million).

■ Alternatively, Judge Leval observed that the same enhancement would apply even if he calculated the loss at $3,260,000, the total face value of the bogus bonds. *See* U.S.S.G. § 2F1.1 Application Note 7 ("[I]f the fraud consisted of selling or attempting to sell $40,000 in worthless securities, or representing that a forged check for $40,000 was genuine, the loss would be $40,000."). The meaning of the term "loss" under the Sentencing Guidelines is a legal question, reviewable *de novo;* the mathematical computation of the "loss" is a finding of fact which we review for clear error. *See United States v. Deutsch*, 987 F.2d 878, 884–85 (2d Cir.1993).

■ Responding to Judge Leval's alternative holding first, Mucciante argues that the loss should not correspond to the face value of his counterfeit Australian bonds because they were "so obviously fraudulent that no one would seriously consider honoring [them]." U.S.S.G. § 2F1.1 Application Note 10. He points out that the bonds misspelled the word "Commonwealth" as "*Commonwelath.*" He also notes that two of the bonds misstate the amount of interest payable as "*nineteen and one-half percent per annum (18.5)*". We find it difficult to take this argument seriously. Application Note 10 addresses the possibility of a downward departure where the loss overstates the seriousness of the offense; it has nothing to do with the calculation of that loss. In any event, we do not believe that such minor typographical errors, buried as they were within the text of the bonds, render these bonds "obviously fraudulent."

■ On a more reasonable tack, Mucciante argues that the loss should not include amounts that he returned to Berger and the other investors, or amounts that he never intended to keep for himself. He points out that he repaid Horowitz and Yohay their

investments (albeit with Berger's money) and that Berger's actual losses did not approach Judge Leval's calculation. Finally, he claims that his motive was not personal gain, but an "egotistical" desire to "impress" Berger, as well as the members of his law firm. We are unimpressed by this argument.

■ Under section 2F1.1, loss does not always equal the actual financial harm suffered by the victim. *See, e.g., United States v. Arjoon*, 964 F.2d 167, 172 (2d Cir.1992); *United States v. Lohan*, 945 F.2d 1214, 1218 (2d Cir.1991). Where the "intended" loss is greater than the "actual loss," intended loss will be used. U.S.S.G. § 2F1.1 Application Note 7. "Under the Guidelines, 'loss' includes the value of all property taken, even though all or part of it was returned." *United States v. Brach*, 942 F.2d 141, 143 (2d Cir.1991); *see Arjoon*, 964 F.2d at 172. *But see United States v. Holiusa*, 13 F.3d 1043, 1046–47 (7th Cir.1994).

Applying these principles, Mucciante's sentence was properly enhanced. Although he returned some of Berger's money, and repaid Yohay and Horowitz, he did so as part of a meretricious effort to maintain their confidences. He is therefore not entitled to credit for sums returned, or for sums spent for Berger's benefit. Finally, it is of course irrelevant that Mucciante took the money to impress people, rather than for a more sinister purpose.

## CONCLUSION

We have carefully considered all of Mucciante's remaining arguments and find them meritless. The judgment is affirmed.