UNITED STATES of America,

v.

**George SIEMBIDA, Wayne Price and William Ballachey, Defendants.**

No. S4 05 Cr. 366 (PKC).

United States District Court,
S.D. New York.

Oct. 23, 2008.

---

Arthur Gollwitzer, III, Michael Best & Friedrich LLP, Chicago, IL, Arianna Rebecca Berg, United States Attorney SDNY 1 Saint Andrew Department of Justice, Deidre Ann McEvoy, Justin S. Weddle, Katherine Polk Failla, U.S. Attorney's Office, SDNY, New York City, for Plaintiff.

Charles F. Daum, Law Offices of Charles F. Daum, Washington, DC, David Alexander Browde, Law Office of David A. Browde, P.C., Chappaqua, NY, Seth C. Farber, Dewey & LeBoef, L.L.P., Jonathan Marks, Jonathan Marks P.C., New York City, Gary Schoer, Gary Schoer, Esq., Syosset, NY, Larry Howard Krantz,

Krantz & Berman LLP, New York City, for Defendants.

## MEMORANDUM AND ORDER

P. KEVIN CASTEL, District Judge.

Defendants George Siembida and Wayne Price were convicted at trial of conspiracy to commit wire fraud (Count I) and two substantive wire fraud counts (Counts II and III). Defendants now move for judgment of acquittal urging, among other things, that there was insufficient evidence to support a conviction on any count. For reasons explained below, the motion is denied as to the conspiracy count (Count I) and the first of the two wire fraud counts (Count II). The motion is granted as to second wire fraud count (Count III) because, viewing the evidence in a light most favorable to the government, no reasonable jury could conclude that the single wire communication from the undercover agent to defendant Price was "in furtherance of" the scheme to defraud.

The indictment charged that the defendants collected fees from customers for financial guarantee bonds purportedly issued by an Indonesian subsidiary of a well-established Germany-based financial services company, Allianz A.G. ("Allianz"). Financial guarantees or performance bonds are typically issued to provide comfort to one contracting party that the financial obligations of the other contracting party will be backed up by a solvent entity, such as a highly-rated insurer. At trial, it was undisputed that the Allianz bonds obtained by Price and Siembida for their clients during the period of the conspiracy were not, in fact, genuine obligations of any affiliate of Allianz.

The evidence at trial showed that Wayne Price and George Siembida operated separate and largely independent businesses. Price operated Melwain Enterprises, Inc. ("Melwain") and Siembida operated All

Clear Corp. The evidence showed that the two defendants were on notice that the bonds they provided did not represent valid obligations of Allianz but continued to sell them to unsuspecting customers. The nature of the financial guarantee business was such that the bogus nature of the bond would not ordinarily come to light unless and until the bond purchaser defaulted under its contract.

*Standard for a Rule 29(c) Motion for a Judgment of Acquittal*

A defendant challenging the sufficiency of the evidence to support his conviction "bears a heavy burden." *United States v. Jones,* 455 F.3d 134, 143 (2d Cir.2006), *cert. denied,* 549 U.S. 1231, 127 S.Ct. 1306, 167 L.Ed.2d 119 (2007) (internal quotation marks and citation omitted). A district court evaluating such challenges is required to view the evidence in the light most favorable to the government and to "defer[ ] to the jury's evaluation of the credibility of the witnesses, its choices between permissible inferences, and its assessment of the weight of the evidence." *Id.* *See also United States v. Florez,* 447 F.3d 145, 156 (2d Cir.2006), *cert. denied,* 549 U.S. 1040, 127 S.Ct. 600, 166 L.Ed.2d 445 (2006) ("We will not attempt to second-guess a jury's credibility determination on a sufficiency challenge.") (citations omitted).

Motions for acquittal pursuant to Rule 29, Fed.R.Crim.P., should be granted "only if the district court concludes there is 'no evidence upon which a reasonable mind might fairly conclude guilt beyond a reasonable doubt,'" and the defendant shows that "no rational trier of fact could have found him guilty." *United States v. Irving,* 452 F.3d 110, 117 (2d Cir.2006) (quoting *United States v. Taylor,* 464 F.2d 240, 243 (2d Cir.1972)) (citations omitted). The court is to "consider the evidence in its totality, not in isolation, and the govern-

ment need not negate every theory of innocence." *United States v. Autuori*, 212 F.3d 105, 114 (2d Cir.2000) (citation omitted). Where "the court concludes that either of the two results, a reasonable doubt or no reasonable doubt, is fairly possible, [the court] must let the jury decide the matter." *Id.* (citations and internal quotation marks omitted) (alteration in original).

*Count One: Sufficiency of the Evidence on Conspiracy*

■ Count One charged Price, Siembida and William Ballachey, who operated in Canada and had not been apprehended prior to trial, with conspiring from January 2003 to November 2004 to commit wire fraud. An object of the conspiracy was to transmit or cause to be transmitted wire communications in aid of a scheme to defraud. The indictment describes the scheme as the offering and sale of financial guarantee bonds of an Indonesian subsidiary of Allianz. The indictment alleges that the defendants required the victims to pay up-front, non-refundable "manuscripting" or underwriting fees and a substantial deposit. It alleges that defendants were warned by Allianz and others that the bonds were not authentic and that they continued to sell them anyway.

The evidence at trial consisted of the testimony of several victims, an investigator employed by an affiliate of Allianz, the employee responsible for compliance issues in Asia for Allianz, a compliance representative for the German parent corporation, a lawyer for Allianz who wrote to Price and Ballachey placing them on notice of the fraudulent nature of the bonds, a representative of the New York State Department of Insurance who confirmed that

Price and Siembida were not licensed by the Department of Insurance during the relevant time period, an undercover agent who had interactions with Price and Siembida using two different identities and an expert on SWIFT messages.[1] Certain bank records were admitted. Admissions made by Siembida to a special agent of the FBI after his arrest were admitted against Siembida with a limiting instruction.

■ Defendants challenge the sufficiency of the evidence on conspiracy. "To sustain a conspiracy conviction, the government must present some evidence from which it can reasonably be inferred that the person charged with conspiracy knew of the existence of the scheme alleged in the indictment and knowingly joined and participated in it." *United States v. Lorenzo*, 534 F.3d 153, 159 (2d Cir.2008) (quoting *United States v. Rodriguez*, 392 F.3d 539, 545 (2d Cir.2004)). "[A] conspiracy by its very nature is a secretive operation, and it is a rare case 'where all aspects of a conspiracy can be laid bare in court with the precision of a surgeon's scalpel.'" *United States v. Pitre*, 960 F.2d 1112, 1121 (2d Cir.1992) (quoting *United States v. Provenzano*, 615 F.2d 37, 45 (2d Cir.1980), *cert. denied*, 446 U.S. 953, 100 S.Ct. 2921, 64 L.Ed.2d 810 (1980)). "[A] defendant's knowing agreement to join a conspiracy must, more often than not, be proven through circumstantial evidence." *United States v. Lorenzo*, 534 F.3d at 161 (quoting *United States v. Nusraty*, 867 F.2d 759, 764 (2d Cir.1989)). Indeed, the existence of the conspiracy and a defendant's participation therein may be proven based solely on circumstantial evidence. *United States v. Pitre*, 960 F.2d at 1121. Evidence of mere presence or mere association with

---

1. SWIFT is an acronym for the "Society for Worldwide International Financial Telecommunications." (Tr. 879.) It is described as a secure network for member institutions to transmit and receive electronic communications and is akin to a private email network. (*Id.*)

conspirators is insufficient to support a conviction for conspiracy. *United States v. Lorenzo,* 534 F.3d at 159–60.

Here, the government's evidence of conspiracy was circumstantial and no cooperator testimony was presented. It was nevertheless strong and more than sufficient to sustain a conviction. Peter Tsou of Custom Marine International ("CMI"), a builder of luxury yachts in China, testified that U.S. banks required performance bonds from CMI. Tsou's insurance agent recommended Siembida as a person who might be able to obtain a performance bond. (Tr. 593.) Tsou contacted Siembida and Siembida asked for financial information about CMI. (Tr. 593–94.) Siembida eventually told Tsou that Allianz could provide the performance bond for him. (Tr. 594.) Siembida also told Tsou that "[h]e himself could not issue the bond or be the agent for the bond and that to pursue this he will bring in another party in for the paperwork." (Tr. 594.) The other party was Price. (Tr. 595.) Siembida told Tsou that the price for the bond would be 5% of Tsou's $6.1 million yacht-building contract price. He agreed to contact Price and thereafter Tsou received a fax from Price on Melwain letterhead. Price's fax advised Tsou that "after discussion with our Allianz A.G. representative, they have advised us to submit all the documentation to them for complete review, but at this time the submission appears do-able." (GX 721–A.) Price sent Tsou the proposed language of the bond. (GX 720.) Tsou was then told that the cost of the bond would be 6% rather than 5% of Tsou's underlying contract. (Tr. 605.) Price billed Tsou $372,000, representing 6% of 6.1 million plus a $5,000 application fee. (Tr. 608; GX 705.) Tsou balked at the 6% and was told by Price that he could pay 5% now ($310,000) and 1% after the bond was delivered. (Tr. 609; GX 706, 707.) Tsou paid the $310,000 to Price's Melwain. (Tr. 614.)

When Tsou did not receive the bond in the promised five to ten business days, he began calling Siembida and Price. (Tr. 615.) Siembida told him that a man in Canada named Ballachey was in contact with the Allianz office in Indonesia and there were some communication problems but that they were working on it. (*Id.*) Price told Tsou "[b]asically the same story" and that he, Price, was in touch with Ballachey about the problem. (*Id.*) When a month passed without a bond, Tsou traveled from Indianapolis, Maryland to Long Island to meet with Price. (Tr. 616.) Eventually, Tsou received the bond from Siembida. (Tr. 621.) Siembida signed the bond, which was purportedly issued by "PT Assuransi Allianz Life Indonesia" and bore the logo of Allianz as the attesting witness. (GX 14.)

A Special Agent of the FBI examined the bank records for Melwain and for Siembida's company, All Clear Corp. She reconstructed the flow of money following Tsou's payment to Melwain. (GX 1285.) On June 18, 2004, Melwain received $309,985 from Tsou's CMI. The money was transferred from one Melwain account to a second Melwain account and, on June 21, 2004, $60,000 was transferred from the second Melwain account to Siembida's account. On July 7, 2004, the sum of $183,000 was transferred from a Melwain account to Ballachey's account at his company, Stonecroft Services. Also, the government was able to show the flow of money from victims to Price and from Price to Siembida and/or Ballachey in at least one other guarantee bond transaction. (GX 1287; Tr. 1019–20.) All together, Price sent money to Siembida on at least 15 occasions, totaling approximately $697,000.

At trial, the defendants did not contest that the bonds were fake but denied knowledge of the forgery. The govern-

ment introduced evidence that defendants knew the bonds were bogus, including a letter faxed to Price in which the President Director of PT Asuransi Allianz Life Indonesia stated that the company "has never issued any kind of financial guarantee such as[a b]ond and liability insurance." (GX 53A.) The government also established that, on June 22, 2004, shortly after Tsou transferred funds to Price, another victim named Craig Heard spoke to Price and sent Price a copy of a letter that he (Heard) had received from one of Allianz's attorneys. The letter referred to a bond that Heard's company had received and advised Heard that "no such bond ha[d] been issued by an Allianz Group company and no such bond is within the authorized business activity of any Allianz Group company identified in the purported bond documents." (GX 114.) Siembida's own knowledge of the fraudulent nature of the bonds was admitted in post-arrest proffer sessions. (Tr. 1009, 1074.)

There was sufficient evidence from which a reasonable jury could conclude that Price and Siembida knew of the existence of the scheme alleged in the indictment, agreed to participate in that scheme, and in fact participated in essential elements of the scheme. The motion for a judgment of acquittal as to Count One is denied.

*Count Two: The Interstate Commerce Requirement of Wire Fraud*

■ Count Two, a substantive wire fraud count, was premised upon an August 16, 2004 email from Siembida to Special Agent Michael Keeley of the FBI, who was posing as "Jay Parker", a representative of a potential purchaser of a bond. Defendants assert that there was insufficient evidence from which a reasonable jury could conclude that the email passed through interstate commerce. The email, GX 1005, laid out a scheme for Siembida to send an invoice from his company, All Clear Corp., to "Parker" for $6,000. "Parker" would then collect $6,000 from his "client" but forward only $5,000 to Siembida. In other words, Siembida's invoice would be the means for "Parker" to deceive his "client" into believing that the entire $6,000 was for services rendered by All Clear Corp., when, in truth, $1,000 was to be retained by "Parker"—the equivalent of a kickback.

The August 16 email was sent by Siembida from his "adelphia.net" email account and attached wiring instructions for payment. The email was sent to "Parker" in Manhattan at an address ending in "nyc.rr.com." Both Siembida and the undercover agent were in New York at the time the email was sent and received. Siembida suggested using email for communications with the undercover agent. (GX T–1051(R) at 2.) There was also testimony in the form of recorded conversations with Siembida in which he stated that he worked from a basement office in his home (*id.* at 2–3.) and that he worked alone (GX T–1055(A) at 5.).

At trial, the government offered a stipulation among the parties that, if called, Hans Nielsen, a "Senior Messaging Engineer" for Time Warner Cable who was employed by Adelphia from 2003 to early 2006, would testify that he was familiar with the Adelphia email system utilized by Siembida. (GX 1501.) It was further stipulated that the Adelphia servers were at the relevant time located in Coudersport, Pennsylvania and that any email sent via an "adelphia.net" email address would have been routed through Coudersport. The stipulation further recited that Nielsen would testify that he examined an email sent by Siembida four days after the email at issue (on August 20) and concluded that Siembida had configured his email system to route through the Coudersport servers.

■ On these facts, a rational trier of fact could have found beyond a reasonable doubt that the August 16 email passed in interstate commerce. It would not be unreasonable to infer that the configuration of Siembida's email account as it existed on August 16 was identical to that on August 20, in the absence of evidence that would render the inference illogical or implausible. If the email was configured on August 16 in the manner in which it was configured on August 20, then according to the testimonial stipulation the email would have passed through servers physically located in Coudersport, Pennsylvania. A communication from one location within a state to another location within that same state which passes through another state may satisfy the interstate requirement, even if the defendant has no reason to know of the interstate character of the communication. *See Ideal Steel Supply Corp. v. Anza,* 373 F.3d 251, 265 (2d Cir. 2004), *rev'd on other grounds,* 547 U.S. 451, 126 S.Ct. 1991, 164 L.Ed.2d 720 (2006) ("As a matter of substance, it is possible for a wire communication whose origin and ultimate destination are within a single state to be routed through another state."). *See also United States v. Davila,* 592 F.2d 1261, 1263–64 (5th Cir.1979).

■ Defendants also advance the argument that a conviction based upon a facially intrastate communication that only incidentally crossed state borders exceeds Congress's Commerce Clause power to regulate.[2] Defendants do not appear to argue that the wire fraud statute is unconstitutional on its face, but they argue that the statute is unconstitutional as applied to a communication that is intended to be intrastate. No principled reason has been advanced why criminal penalties could not attach to a knowing fraud committed through a means or instrumentality of interstate communication, regardless of the locus of the addressor and addressee. *See United States v. Lopez,* 514 U.S. 549, 558, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995). Under existing case law, the interstate requirement is a jurisdictional prerequisite and the defendant need not have known of the interstate nature of the communication. *See United States v. Blackmon,* 839 F.2d 900, 907 (2d Cir.1988) (citing *United States v. Blassingame,* 427 F.2d 329, 330–31 (2d Cir.1970), *cert. denied,* 402 U.S. 945, 91 S.Ct. 1629, 29 L.Ed.2d 114 (1971)) ("This court has unambiguously held that there is no *mens rea* requirement as to the purely jurisdictional element of interstate communication under the wire fraud statute."). Here, of course, Siembida elected to use an email provider who, at or about the time of the email at issue, had all of its email servers based in another state.

The motion for a judgment of acquittal as to Count Two is denied.

*Count Three: The "In Furtherance" Requirement of Wire Fraud*

■ Count Three charged wire fraud in connection with the overall scheme and is premised upon the defendants causing the transmission of an email from the undercover agent in New York to Wayne Price in New York. The email was transmitted via a server located in Virginia. Defendants argue that the email, which was sent on July 14, 2004 by Special Agent Keeley (posing as "James Webber") and addressed to Wayne Price (using the name "Peter Gabriel"), was not in furtherance of the scheme to defraud.

Keeley testified that he called the Melwain office on June 25, 2004. (Tr. 865–66.) He left a message saying that he had

---

**2.** Defendants advance this argument as to both Counts Two and Three. Because a judgment of acquittal will be entered as to Count Three, I will only consider the argument as to Count Two.

clients who were looking for bonds and left a call back number. (Tr. 866.) Neither Price nor anyone else at Melwain called back. (*Id.*) On July 14, Keeley made a second call to Melwain. He spoke with an unidentified female and indicated that he was searching for local bonding companies. (Tr. 780.) Price took the call and, before Keeley's character spoke, identified himself as "Peter Gabriel." (GX T–1050 at 2.) In that brief call, Keeley, posing as "Webber," told Price that he had found Melwain through a Google search and that he had a lot of clients across the country who took out loans in the range of $900,000 to $80 million. (*Id.*) "Webber" said that he was inquiring "to see if anybody … has any interest in looking at some of the projects that I have … with my clients." (*Id.*) Price asked whether the bonding company needed to be domestic and explained that, if so, "over a million dollars it's not gonna happen for … investment capital, at least I can't do it." (*Id.* at 3.) The undercover mused aloud that "… if I can convince them that … an off-shore … financial guarantee of some sort would work, then that would work." (*Id.* at 3–4.) Price made no effort to sell "Webber" on any idea or concept during the call. Finally, Price said "Okay. Well why don't ya send me some kind of a … proposal like a, for a specific thing and I'll see what I can do with it." (*Id.* at 4.) Price told "Webber" that he could send his proposal by email and added that, "I can probably have some kind of an answer or something in writing, at least I'll … pass it by some of my, some of the clients, some of the contacts and companies I have … and I'll see if I can help ya." (*Id.*)

The July 14 email that "Webber" later sent to Price is the email that is alleged to be in furtherance of the scheme to defraud. That email describes three deals that "Webber's" "clients" had in the works:

"My clients range in deals from approximately $1 million to $100 million

and more. Listed below are three such clients I am currently working on. All three are in process to the stage of loan qualification with a New York venture capital lender, but require the additional comfort level of a guarantee. I am told by the prospective lender that stateside and off-shore underwriters of the bond would be acceptable in most instances."

(GX 1003.) The email also describes "Webber's" company and very briefly outlines three projects: a loan of $950,000 for a restaurant in Red Bank, New Jersey; a startup hybrid engine operation with a business plan calling for an equity infusion of $80 million that could commence operations for as little as $3 million; and a fruit processing and juice packaging operation in New York seeking to raise $65 million in the form of equity and debt. Price never responded to "Webber's" email. (Tr. 867.) Neither defendant did anything whatsoever in response to the email.

The question presented by defendants' motion is whether, drawing all reasonable inferences in favor of the government, a reasonable jury could conclude that the email sent by the undercover agent was in furtherance of the scheme charged in the indictment. This Court concludes that a reasonable jury could not so conclude.

In relevant part, section 1343 of title 18 provides that:

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire … communication in interstate or foreign commerce, any writings … for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both.

■ "The elements of mail or wire fraud are (i) a scheme to defraud (ii) to get money or property, (iii) furthered by the use of interstate mail or wires." *United States v. Autuori,* 212 F.3d at 115 (citing *United States v. Zagari,* 111 F.3d 307, 327 (2d Cir.1997)). As noted, the defendants challenge the assertion that "Webber's" July 14 email can satisfy the "in furtherance" requirement. The government correctly notes that the wire communication need not be an essential element of the scheme and may be incident to an essential part or step in the scheme. *Schmuck v. United States,* 489 U.S. 705, 710–11, 109 S.Ct. 1443, 103 L.Ed.2d 734 (1989), *rehearing denied,* 490 U.S. 1076, 109 S.Ct. 2091, 104 L.Ed.2d 654 (1989).

For the purposes of this motion, the Court assumes that an email sent by an undercover agent posing as a would-be victim of a fraud could satisfy the "in furtherance" requirement even though monitoring by law enforcement precluded any scheme from actually succeeding. *Cf. United States v. Merklinger,* 16 F.3d 670, 679 (6th Cir.1994) (letter from government official, identified as such, sent as part of a governmental investigation did not satisfy the "in furtherance" requirement). This Court also assumes that an email from a third-person induced by a fraud-doer could satisfy the "in furtherance" requirement.

"The relevant question at all times is whether the mailing is part of the execution of the scheme as conceived by the perpetrator at the time, regardless of whether the mailing later, through hindsight, may prove to have been counterproductive ...." *Schmuck v. United States,* 489 U.S. at 715, 109 S.Ct. 1443. Here, the proof must be such that a reasonable jury could conclude that, at the time Price induced "Webber" to send the email, he did so as part of the scheme charged in the indictment. Judged in the totality of the

evidence, the July 14 email cannot satisfy this element.

The government failed to present evidence from which a reasonable jury could conclude that, at the time Price asked "Webber" to send "some kind of a ... proposal like a, for a specific thing," he had in mind the scheme. There was no proof presented that all or substantially all of the financial guarantee bonds arranged by Price or his co-defendant were false, fraudulent and/or bogus. Indeed, the government's proof was to the contrary. Price had secured bonds for one client from other insurance companies, such as Lumberman's Insurance and Kemper Insurance, and there was no suggestion that these bonds were in any way tainted. (Tr. 63.) Price told another client that he could underwrite a bond with Western Insurance if it were not in excess of $10 million. (Tr. 209.) He first proposed to one client a bond with an Asian company which was unacceptable to the client because it was not A-rated. Only in a subsequent call did he then propose to that same client that a bond be obtained from the Indonesian subsidiary of Allianz. (Tr. 209–10.) At most, the evidence showed that Price did some business that was lawful and some that was unlawful. At the time Price induced the undercover agent to send an email, he had scant information about the needs or desires of "Webber's" "clients". For all Price knew at the time of the conversation, "Webber's" email might have set out parameters which would have enabled him to construct perfectly lawful and highly lucrative deals.

■ The fact that Price used the name "Peter Gabriel" is not, either alone or taken together with all surrounding circumstances, sufficient to permit the jury to infer that the induced email was in furtherance of the scheme. "Webber" began his very brief conversation with the un-

identified female who answered the phone at Melwain without so much as offering a polite greeting. He started with the following: "Urn, I was trying to, I left a message, I can't remember the individual's name there. Urn, who's in charge there?" (GX T–1050 at 1.) He fleetingly mentioned to the female the words "insurance bonding for loans" and "[f]inancial guarantees and some things like that nature." (*Id.*) Price picked up the phone and identified himself to the caller as "Peter Gabriel" before the undercover agent had uttered a single word to him. (GX T–1050 at 2.) The government's own evidence was that reputation was important to a bond purchaser, that Price had used his own name in licit and illicit dealings with clients, and that Price did business with those who had been introduced to him by others. (Tr. 60; 208.) In the context of (i) a cold call which began with the inquiry of "who's in charge there" and (ii) Price's pattern of using his real name when doing lawful and unlawful business, the use of a pseudonym loses its incriminating quality. The use of a pseudonym is equally consistent with a belief that the cold call was unlikely to result in any business, lawful or unlawful. In context, the inference the government would draw is neither reasonable nor sufficient to support the conclusion that the induced email was "in furtherance of" the scheme.

Just as a defendant may not use hindsight to disqualify a wire transmission from the "in furtherance" requirement, the government may not establish the requirement solely on the basis of subsequent events. In any event, subsequent events in this case do not help the government's cause. As noted, the undercover agent testified that Price never responded to his email. (Tr. 867.) According to the undercover, "[a] few days later, I think it was within a week's time ...." "Webber" telephoned Melwain. (Tr. 786.) The undercover agent reached a voice mail but did not leave a message. (Tr. 786–87; 868.) Nothing further transpired.

"Where a fact to be proved is also an element of the offense ... 'it is not enough that the inferences in the government's favor are permissible.'" *United States v. Triumph Capital Group, Inc.,* 544 F.3d 149 (2d Cir.2008) (quoting *United States v. Martinez,* 54 F.3d 1040, 1043 (2d Cir.1995)). "A court 'must also be satisfied that the inferences are sufficiently supported to permit a rational juror to find that the element, like all elements, is established beyond a reasonable doubt.'" *Id.* "[I]f the evidence viewed in the light most favorable to the prosecution gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence, then a reasonable jury must necessarily entertain a reasonable doubt." *United States v. Glenn,* 312 F.3d 58, 70 (2d Cir.2002) (internal quotation marks and citations omitted). Viewing the evidence on Count Three in its totality and in a light most favorable to the government, no rational jury could find beyond a reasonable doubt that the email sent by the undercover agent to Price was "in furtherance of" the scheme alleged in the indictment. The motion for a judgment of acquittal as to Count Three is granted.

*Motions For a New Trial Pursuant to Rule 33*

Rule 33(a), Fed.R.Crim.P., provides that a court may vacate a judgment and grant a new trial "if the interest of justice so requires." Though the rule provides broad discretion to the court to grant a new trial, and, unlike Rule 29, empowers the court to consider witness credibility, the court "must strike a balance between weighing the evidence and credibility of witnesses and not wholly usurp[ing] the role of the jury." *United States v. Ferguson,* 246 F.3d 129, 133 (2d Cir.2001) (inter-

nal quotation marks and citation omitted, brackets in original). Rule 33 motions should be granted " 'sparingly' and in 'the most extraordinary circumstances.' " *Id.* at 134 (quoting *United States v. Sanchez*, 969 F.2d 1409, 1414(2d Cir.1992)).

▮ "[O]n a Rule 33 motion to vacate, the ultimate test is whether letting a guilty verdict stand would be a manifest injustice. In other words, there must be a real concern that an innocent person may have been convicted." *United States v. Snype*, 441 F.3d 119, 140 (2d Cir.2006), *cert. denied*, 549 U.S. 923, 127 S.Ct. 285, 166 L.Ed.2d 218 (2006), *and rehearing denied*, 549 U.S. 1090, 127 S.Ct. 759, 166 L.Ed.2d 587 (2006) (internal quotation marks, citations and brackets omitted); *Ferguson*, 246 F.3d at 134 (citation omitted).

▮ Weighing the evidence and taking into account the credibility of the witnesses, there has been no miscarriage of justice or "seriously erroneous result." *United States v. Triumph Capital Group, Inc.*, 544 F.3d at 159 (citing *Smith v. Carpenter*, 316 F.3d 178, 183 (2d Cir.2003)). Counts One and Two were well-supported by credible and ample evidence.

▮ Defendants further argue that the inclusion of an aiding or abetting charge on the substantive wire fraud counts resulted in a prohibited constructive amendment of the indictment. "To prevail on a constructive amendment claim, a defendant must demonstrate that either the proof at trial or the trial court's jury instructions so altered an essential element of the charge that, upon review, it is uncertain whether the defendant was convicted of conduct that was the subject of the grand jury's indictment." *United*

*States v. Frank*, 156 F.3d 332, 337 (2d Cir.1998), *cert. denied*, 526 U.S. 1020, 119 S.Ct. 1257, 143 L.Ed.2d 353 (1999) (citation omitted). "[T]he inclusion of an aiding and abetting charge to the jury will rarely, if ever, constructively amend an indictment because an aiding and abetting charge is arguably implicit in every indictment." *United States v. Mucciante*, 21 F.3d 1228, 1234 (2d Cir.1994), *cert. denied*, 513 U.S. 949, 115 S.Ct. 361, 130 L.Ed.2d 315 (1994) (citation omitted). A court may properly give an aiding and abetting charge even if no reference to the aiding and abetting statute appears in the indictment, because the statute does not "penalize conduct apart from the substantive crime with which it is coupled." *Id.* However, the citation to the statute in the indictment does not dispense with the need for further analysis of whether there has been a constructive amendment. *Id.*

▮ The indictment (Counts Two and Three) expressly referred to 18 U.S.C. § 2, the statutory predicate for aider or abettor liability.[3] Specifically, with regard to Count Two, the surviving wire fraud count, the indictment alleged that the three defendants "did transmit and cause to be transmitted" the email which, it further alleges, was sent by Siembida. Siembida and Price could be guilty, under the Court's instructions, if they directly committed the crime charged or "willfully caused the commission of that crime." (Tr. 1301–02.) The aiding and abetting instruction fit the crime charged in the indictment and the evidence presented at trial. There was no constructive amendment of the indictment.

**3.** 18 U.S.C. § 2 provides as follows:

(a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.

(b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal.

**602**

Defendants also assert that it was prejudicial error to charge the jury on conscious avoidance as it related to the issue of defendants' knowledge. "[W]hen knowledge of the existence of a particular fact is an element of an offense, such knowledge is established if a person is aware of a high probability of its existence, unless he actually believes that it does not exist." *United States v. Nektalov*, 461 F.3d 309, 314 (2d Cir.2006) (quoting *Leary v. United States*, 395 U.S. 6, 46 n. 93, 89 S.Ct. 1532, 23 L.Ed.2d 57 (1969)). In order to have a basis to charge the jury on conscious avoidance, the defendant must place in issue his lack of knowledge of a required element of the crime and the evidence must be such that "a rational juror may reach the conclusion 'beyond a reasonable doubt that the defendant was aware of a high probability of the fact in dispute and consciously avoided confirming that fact.'" *Id.* at 314 (quoting *United States v. Rodriguez*, 983 F.2d 455, 458 (2d Cir.1993)). Here, both defendants denied knowing that the bonds were not genuine.[4] But there was more than ample evidence from which a jury could conclude beyond a reasonable doubt that each defendant was aware of a high probability that the bonds were fake and consciously avoided confirming that fact. (Siembida Tr. 336, 635–640, 737–741, 1009–1012; Price Tr. 102–106, 225–226, 239–242, 325, 408–416, 425–426, 437–438, 636–640.)

Finally, I have considered whether a new trial is warranted because of the judgment of acquittal on Count Three. There was not any evidence on this count that was prejudicial or inflammatory. True,

Price identified himself using the name of pop star but he made no incriminating statements in the call and the call amounted to naught.

*Conclusion*

For the reasons set forth above, the motions of defendants Siembida and Price for a judgment of acquittal under Rule 29 are GRANTED as to Count Three and otherwise DENIED. The motions of defendants Siembida and Price for a new trial under Rule 33 are DENIED.

SO ORDERED.

---

4. Opening statement of Price, Tr. at 44: "... you will hear evidence that will raise numerous reasonable doubts as to whether or not Wayne Price knew these bonds or had a reason to know these bonds that he was obtaining were fraudulent." Opening statement of Siembida, Tr. at 50: "... we all know now, ... these bonds were not authorized Allianz

bonds. That is not something that is going to be disputed in this trial, but Mr. Siembida and Mr. Price didn't know that at the time. Yes, you'll hear that Mr. Siembida and Mr. Price got complaints, allegations the bonds might not be real, but you will hear they tried to verify those complaints and got a stream of conflicting information back and forth."